ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br><br>v.<br><br><br><br><br>JEROMY PIETRI NAPOLEONI<br><br>Parte Apelante | KLAN202300886 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Ponce<br><br>Casos Núms.:<br>J VI2023G0006<br>J VI2023G0007<br>J LA2023G0015<br>J LA2023G0016<br>J LA2023G0017<br>J BD2023G0010<br>J BD2023G0011<br><br>Sobre:<br>Art. 93(a) C.P.<br>Tent. Art. 93(a) C.P.<br>Art. 6.05 Ley 168<br>Art. 6.14(a) Ley 168<br>Art. 6.14(b) Ley 168<br>Art. 190(c) C.P. (2 cargos) |
| | Consolidado con | |
| EL PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br><br><br>v.<br><br><br><br><br>ANA INÉS NAPOLEONI MEDINA<br><br>Parte Apelante | KLAN202300887 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Ponce<br><br>Casos Núms.:<br>J VI2023G0008<br>J VI2023G0009<br>J LA2023G0018<br>J LA2023G0019<br>J LA2023G0020<br>J BD2023G0012<br>J BD2023G0013<br>J FJ2023G0002<br><br>Sobre:<br>Art. 93(a) C.P.<br>Tent. Art. 93(a) C.P.<br>Art. 6.05 Ley 168<br>Art. 6.14(a) Ley 168<br>Art. 6.14(b) Ley 168<br>Art. 190(c) C.P. (2 cargos)<br>Art. 283 C.P. |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Cruz Hiraldo y el Juez Campos Pérez[1].

Campos Pérez, Juez Ponente

---

[1] El Hon. José I. Campos Pérez sustituyó al Hon. José Johel Monge Gómez, por virtud de la Orden Administrativa TA-2023-212, emitida el 6 de diciembre de 2023.

Número Identificador

SEN2025_____

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de enero de 2025.

Comparecen las partes apelantes, el Sr. Jeromy Pietri Napoleoni (señor Pietri Napoleoni) y la Sra. Ana Inés Napoleoni Medina (señora Napoleoni Medina). Solicitan que revoquemos las *Sentencias* emitidas en su contra el 6 de septiembre de 2023, por el Tribunal de Primera Instancia, Sala de Ponce (TPI). Por virtud de los referidos pronunciamientos, los apelantes fueron condenados a cumplir 139 años de prisión, luego de que fueran juzgados por un Tribunal de Derecho y encontrados culpables mediante los respectivos fallos dictados el 17 de julio de 2023.

Anticipamos que, por los fundamentos que expondremos a continuación, se confirman las *Sentencias* apeladas.

**I.**

Luego de observados los procedimientos de rigor,[2] por hechos acontecidos en las horas de la tarde del 14 de noviembre   de 2022 —en que resultó asesinado Jancarlo Rivera Lugo y sobrevivió Jineyshka Cruz Bonilla— el Ministerio Público presentó las siguientes **siete acusaciones** contra el señor Pietri Napoleoni:

> EL REFERIDO IMPUTADO, JEROMY PIETRI NAPOLEONI, ALLÁ EN O PARA EL 14 DE NOVIEMBRE DE 2022, APROXIMADAMENTE A LAS 4:42 PM Y EN PONCE, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, EN CONCIERTO Y COMÚN ACUERDO CON SU MADRE ANA INÉS NAPOLEONI MEDINA.
>
> **J VI2023G0006 (Asesinato en Primer Grado)**
> … A PROPÓSITO, OCASIONÓ LA MUERTE AL SER HUMANO JANCARLO RIVERA LUGO, CONSISTENTE EN QUE POR ÓRDENES DE SU MADRE, EJECUTÓ A LA VÍCTIMA HACIÉNDOLE UN DISPARO EN EL ÁREA DEL COSTADO QUE LE CAUSÓ LA MUERTE.
>
> **J VI2023G0007 (Tentativa de Asesinato)**
> … A PROPÓSITO, REALIZÓ ACTOS INEQUÍVOCA E INMEDIATAMENTE DIRIGIDOS A OCASIONAR LA MUERTE AL SER HUMANO JINEYSHKA CRUZ BONILLA, CONSISTENTE EN QUE APUNTÓ Y DISPARÓ CON UN ARMA DE FUEGO A LA VÍCTIMA, ACCIÓN QUE NO SE CONSUMÓ

---

[2] El 23 de noviembre de 2022, el Ministerio Público presentó siete denuncias en contra del señor Pietri Napoleoni y ocho denuncias contra la señora Napoleoni Medina. Véase, Autos Originales.

POR CIRCUNSTANCIAS AJENAS A LA VOLUNTAD DEL IMPUTADO.

**J LA2023G0015 (Portación, Transportación o Uso de Armas de Fuego sin Licencia)**
… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, PORTÓ, POSEYÓ Y UTILIZÓ SIN AUTORIZACIÓN DE ESTA LEY UN ARMA DE FUEGO COLOR NEGRA Y MARRÓN LA CUAL UTILIZÓ PARA DAR MUERTE AL SER HUMANO JANCARLO RIVERA LUGO.

**J LA2023G0016 (Disparar Armas de Fuego)**
… ILEGAL VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO COLOR NEGRA Y MARRÓN HACIA EL SR. JANCARLO RIVERA LUGO SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**J LA2023G0017 (Apuntar Armas de Fuego)**
… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, APUNTÓ UN ARMA DE FUEGO COLOR NEGRA Y MARRÓN HACIA LA SRA. JINEYSHKA CRUZ BONILLA SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**J BD20230010 (Robo Agravado)**
… A PROPÓSITO SE APROPIÓ DE UN CELULAR MODELO IPHONE 13, COLOR NEGRO, PROPIEDAD DEL SR. JANCARLO RIVERA LUGO, SUSTRAYÉNDOLO DE LA PERSONA EN SU INMEDIATA PRESENCIA Y CONTRA SU VOLUNTAD POR MEDIO DE VIOLENCIA E INTIMIDACIÓN PARA RETENER LA COSA APROPIADA INFLIGIENDO DAÑO FÍSICO A LA VÍCTIMA Y A JINEYSHKA CRUZ BONILLA CONSISTENTE EN QUE LO AGREDIÓ EN EL ROSTRO, LE DISPARÓ CON UN ARMA DE FUEGO Y LUEGO DE FORMA VIOLENTA Y AGRESIVA LES ARREBATÓ EL CELULAR.

**J BD20230011 (Robo Agravado)**
… A PROPÓSITO SE APROPIÓ DE UN CELULAR MODELO IPHONE 13, COLOR AZUL OSCURO, PROPIEDAD DE LA SRA. JINEYSHKA CRUZ BONILLA, SUSTRAYÉNDOLO DE LA PERSONA EN SU INMEDIATA PRESENCIA Y CONTRA SU VOLUNTAD POR MEDIO DE VIOLENCIA E INTIMIDACIÓN PARA RETENER LA COSA APROPIADA INFLIGIENDO DAÑO FÍSICO A LA PERJUDICADA CONSISTENTE EN QUE LE DIO GOLPES EN LA ESPALDA Y LE ARREBATÓ EL CELULAR.

Por los mismos hechos, el Ministerio Público presentó las siguientes **ocho acusaciones** contra la señora Napoleoni Medina:

LA REFERIDA IMPUTADA, ANA INÉS NAPOLEONI MEDINA, ALLÁ, EN O PARA EL 14 DE NOVIEMBRE DE 2022, APROXIMADAMENTE A 4:42 PM Y EN PONCE, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, EN CONCIERTO Y COMÚN ACUERDO CON SU HIJO JEROMY PIETRI NAPOLEONI…

**J VI2023G0008 (Asesinato en Primer Grado)**
… A PROPÓSITO, OCASIONÓ LA MUERTE AL SER HUMANO JANCARLO RIVERA LUGO, CONSISTENTE EN QUE BUSCÓ A SU HIJO JEROMY PIETRI NAPOLEONI, PARA QUE

SALIERA CON UN ARMA DE FUEGO, QUIEN POR ÓRDENES DE ÉSTA, EJECUTÓ A LA VÍCTIMA HACIÉNDOLE UN DISPARO EN EL ÁREA DEL COSTADO QUE LE CAUSÓ LA MUERTE.

**J VI2023G0009 (Tentativa de Asesinato)**
… A PROPÓSITO, REALIZÓ ACTOS INEQUÍVOCA E INMEDIATAMENTE DIRIGIDOS A OCASIONAR LA MUERTE AL SER HUMANO JINEYSHKA CRUZ BONILLA, CONSISTENTE EN QUE APUNTÓ Y DISPARÓ CON UN ARMA DE FUEGO A LA VÍCTIMA, ACCIÓN QUE NO SE CONSUMÓ POR CIRCUNSTANCIAS AJENAS A LA VOLUNTAD DE LA IMPUTADA.

**J LA2023G0018 (Disparar Armas de Fuego)**
… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, DISPARÓ UN ARMA DE FUEGO COLOR NEGRA Y MARRON HACIA EL SR. JANCARLO RIVERA LUGO SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**J LA2023G0019 (Apuntar Armas de Fuego)**
… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, APUNTÓ UN ARMA DE FUEGO COLOR NEGRA Y MARRÓN HACIA LA SRA. JINEYSHKA CRUZ BONILLA SIN SER OCASIÓN DE LEGÍTIMA DEFENSA PROPIA O DE TERCEROS, NI DE ACTUACIONES EN EL DESEMPEÑO DE FUNCIONES OFICIALES, NI DE DEPORTE.

**J LA2023G0020 (Portación, Transportación o Uso de Armas de Fuego sin Licencia)**
… ILEGAL, VOLUNTARIA, INTENCIONAL Y CRIMINALMENTE, PORTÓ Y UTILIZÓ SIN AUTORIZACIÓN DE ESTA LEY UNA ARMA DE FUEGO COLOR NEGRA Y MARRÓN LA CUAL UTILIZÓ PARA DAR MUERTE AL SER HUMANO JANCARLO RIVERA LUGO.

**J BD2023G0012 (Robo Agravado)**
… A PROPÓSITO SE APROPIÓ DE UN CELULAR MODELO IPHONE 13, COLOR NEGRO, PROPIEDAD DEL SR. JANCARLO RIVERA LUGO, SUSTRAYÉNDOLO DE LA PERSONA EN SU INMEDIATA PRESENCIA Y CONTRA SU VOLUNTAD POR MEDIO DE VIOLENCIA E INTIMIDACIÓN PARA RETENER LA COSA APROPIADA INFLIGIENDO DAÑO FÍSICO A LA VÍCTIMA Y A JINEYSHKA CRUZ BONILLA CONSISTENTE EN QUE LO AGREDIÓ EN EL ROSTRO, LE DISPARÓ CON UN ARMA DE FUEGO Y LUEGO DE FORMA VIOLENTA Y AGRESIVA LES ARREBATÓ EL CELULAR.

**J BD2023G0013 (Robo Agravado)**
… A PROPÓSITO SE APROPIÓ DE UN CELULAR MODELO IPHONE 13, COLOR AZUL OSCURO, PROPIEDAD DE LA SRA. JINEYSHKA CRUZ BONILLA, SUSTRAYÉNDOLO DE LA PERSONA EN SU INMEDIATA PRESENCIA Y CONTRA SU VOLUNTAD POR MEDIO DE VIOLENCIA E INTIMIDACION PARA RETENER LA COSA APROPIADA INFLIGIENDO DANO FISICO A LA PERJUDICADA CONSISTENTE EN QUE LE DIO GOLPES EN LA ESPALDA Y LE ARREBATÓ EL CELULAR.

**J FJ2023G0002 (Amenaza o Intimidación a Testigos)**
LA REFERIDA IMPUTADA, ANA INÉS NAPOLEONI MEDINA, ALLÁ, EN O PARA EL 14 DE NOVIEMBRE DE 2022, APROXIMADAMENTE A LAS 4:42 PM Y EN PONCE, PUERTO

RICO, QUE FORMA PARTE DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE A PROPÓSITO Y CON CONOCIMIENTO AMENAZÓ CON CAUSAR DAÑO FÍSICO A JINEYSHKA CRUZ BONILLA, SIENDO ÉSTA TESTIGO Y/O PERSONA QUE POR SU CONOCIMIENTO DE LOS HECHOS PUDIERA SER LLAMADA A PRESTAR TESTIMONIO EN UNA INVESTIGACIÓN, PROCEDIMIENTO, VISTA O ASUNTO JUDICIAL QUE HUBIESE O NO COMENZADO, CONSISTENTE EN QUE LE MANIFESTÓ QUE SI HABLABA LA IBA A MANDAR A MATAR A ELLA TAMBIÉN, SIENDO LA PERJUDICADA TESTIGO DEL ASESINATO DEL SR. JANCARLO RIVERA LUGO.

Luego de dialogar con sus respectivos representantes legales, el 15 de mayo de 2023, el señor Pietri Napoleoni y la señora Napoleoni Medina **renunciaron al derecho de juicio por jurado**. El TPI examinó bajo juramento a ambos apelantes y determinó que las renuncias fueron libres, voluntarias e inteligentes, por lo que dispuso la continuación de los procedimientos por el Tribunal de Derecho.[3]

El 17 de mayo de 2023, se dieron por leídas las acusaciones y ambos apelantes hicieron **alegación de no culpables**.[4] El juicio en su fondo se celebró el 12 de junio de 2023, continuando los días 5, 6, 10, 12 y 17 de julio de 2023. En éste, las partes ofrecieron y el TPI admitió la **prueba estipulada** descrita a continuación:[5]

**Exhibits 1-8:** 8 fotografías a color, tamaño 4" por 6"

**Exhibits 9-15:** 7 fotografías a color, tamaño 8" por 10"

**Exhibit 16:** *Certificación* suscrita por el Ingeniero Israel Acevedo, Director Interino de Infraestructura Ambiente y Transportación del Municipio Autónomo de Ponce, fechada el 30 de enero de 2023, la cual reza: "Luego de inspección realizada al lugar y a tenor con la rotulación existente en la Calle 8B Sector Nueva Vida, El Tuque, para la fecha de los hechos, 14 de noviembre de 2022, se hace constar que el tránsito discurría de manera bidireccional, es decir, en ambas direcciones". También se estipuló que de declarar el ingeniero Acevedo, testificaría lo certificado.

**Exhibit 17:** Fotocopia de una fotografía del occiso Jancarlo Rivera Lugo.

---

[3] Véase, *Minuta* de 15 de mayo de 2023, Autos Originales.
[4] Véase, *Minuta* de 17 de mayo de 2023, Autos Originales.
[5] Refiérase al sobre intitulado *Prueba Documental Estipulación de las Partes* en los Autos Originales.

**Exhibit 18:** *Solicitud de Servicio Forense ICF-2022-08458* de 14 de noviembre de 2022; *Depósito de Evidencia/Control de Evidencia y Solicitud de Análisis al Laboratorio ICF-2022-08458* (proyectil de bala disparado); *Continuación de Cadena de Custodia de Evidencia ICF-2022-08458*; y *Certificado de Examen Sección de Armas y Fuego y Marcas de Herramientas del Instituto de Ciencias Forenses*, fechado el 31 de marzo de 2023 y suscrito por Aramis Agosto Vega, Examinadora de Armas de Fuego, que establece como resultado: "El fragmento de proyectil de bala marcado E-1, correspondiente a la pieza 5, tiene estriación hacia la derecha y fue disparado por un arma de fuego. No se pudo determinar su calibre y cantidad total de estriado debido a su mutilación y deformación".

**Exhibit 19:** *Informe de Hallazgos de Escena*, en el que se solicita el análisis de la trayectoria y búsqueda de proyectil de bala disparado en la pieza de evidencia de un vehículo de motor marca Toyota, modelo Yaris, color azul, año 2012, cuatro puertas, matrícula IBL-443, el cual presentaba una perforación en el foco trasero, del lado derecho, área media, parte posterior (lado tapa baúl). Luego de la inspección y análisis, se determinó que las características físicas de la perforación eran consistentes con el paso de un proyectil de bala disparado, en trayectoria de atrás, hacia el frente, de derecha a izquierda, de arriba, hacia abajo.

**Exhibit 20:** *Informe Médico-Forense ICF-2022-08458* de Jancarlo Rivera Lugo, suscrito el 30 de enero de 2023 por el Patólogo Forense Francisco Dávila Toro, que concluyó que la causa de muerte fue por homicidio por herida de bala con entrada y salida.

**Exhibit 21:** Cederrón con fotos de la autopsia, correspondientes al *Informe Médico Forense ICF-2022-08458*.

**Exhibit 22:** *Informe de Hallazgos de Escena* preparado por el Investigador Forense Pedro J. Bonilla Laboy, que comprende información del vehículo de motor, tablas de medidas de la escena y croquis.

**Exhibit 23:** Cederrón con videos de la escena tomados por el Investigador Forense Harry Natal Rivera.

**Exhibit 24:** Cederrón con fotografías de la escena tomadas por el Investigador Forense Harry Natal Rivera.

**Exhibit 25:** 1 proyectil ensobrado y sellado con cinta roja ICF2022-08458 E-AF.[6]

**Exhibit 26:** *Mugshot Profile* de la señora Napoleoni Medina.[7]

**Exhibit 27:** *Certificado de Análisis* en el que no se detectó ninguna sustancia volátil, cocaína, opiáceos ni cannabinoides en el occiso Jancarlo Rivera Lugo.[8]

---

[6] Véase, *Minuta* de 12 de junio de 2023, Autos Originales.

[7] Véase, *Minuta* de 5 de julio de 2023, Autos Originales.

[8] Véase, *Minuta* de 7 de julio de 2023, Autos Originales. Acorde con los documentos estipulados, se eximieron las declaraciones de los funcionarios del Instituto de Ciencias Forenses Jaisa Serrano Santos, Félix Vázquez Solís, Ana

Además, durante el juicio en su fondo, se ofreció y se admitió la siguiente **prueba del Ministerio Público (MP)**:[9]

    **Exhibit 1 MP:** *Acta sobre Confrontación Fotográfica* en que la víctima y testigo Jineyshka Cruz Bonilla (señora Cruz Bonilla) identificó la fotografía número 8 correspondiente al señor Pietri Napoleoni.

    **Exhibit 2 MP:** *Acta sobre Confrontación Fotográfica* en que la señora Cruz Bonilla identificó la fotografía número 4 correspondiente a la señora Napoleoni Medina.

    **Exhibit 3 MP:** Cederrón con grabación de la llamada al 911.[10]

    **Exhibit 4 MP:** *Certificación de Duplicado de Grabación de Llamada 9-1-1 (2022-11-14_16.40.23_Ch5889435)* suscrita por Yanderis Pacheco Ortiz y Evelyn Medina Conde.[11]

    **Exhibit 5 MP:** *Informe de Incidente 2022-11-14:100:1430 – 22/11/14 16:40:21* de 911 que expresa, en parte, que una fémina indica que hay un herido, en referencia al occiso; certificado por Yanderis Pacheco Ortiz.[12]

En apoyo a las acusaciones, el Ministerio Público presentó las declaraciones de los siguientes **testigos de cargo**: el padre del occiso, Sr. Carlos Alberto Rivera Dávila; el Investigador Forense, Sr. Pedro Bonilla Laboy; el testigo, Sr. Luis Manuel Báez; el Agente Investigador. Agte. José García Rivas; el Patólogo Forense, Dr. Francisco Dávila Toro; así como la testigo presencial, Jineyshka Cruz Bonilla.[13]

Ponderada la totalidad de la prueba vertida, el 17 de julio de 2023, el TPI emitió los **fallos de culpabilidad** contra el señor Pietri

---

Abigaíl Torres Cruz, María Hernández Miranda, Aixa Estrada Franco, Carlos Vélez Miranda, Harry Natal Rodríguez, al igual que el testimonio de Aramis Agosto Vega y el del ingeniero Israel Acevedo. Véase, *Minuta* de 17 de julio de 2023, Autos Originales y el Tomo IV de la Transcripción de la Prueba Oral, págs. 1169-1170.

[9] Refiérase al sobre intitulado *Prueba Documental Ministerio Público* en los Autos Originales.

[10] La Defensa estipuló la evidencia; véase, *Minuta* de 17 de julio de 2023, Autos Originales.

[11] *Id.*

[12] *Id.* En atención a los Exhibits 3, 4 y 5 del Ministerio Público, con la anuencia de la Defensa, no fue necesaria la comparecencia de las funcionarias del 911 Yanderis Pacheco Ortiz y Evelyn Medina Conde. véase, *Minuta* de 17 de julio de 2023, Autos Originales y el Tomo IV de la Transcripción de la Prueba Oral, págs. 1169-1170.

[13] Los testigos que el Ministerio Público no utilizó se pusieron a disposición de la Defensa; a saber: Sgto. Miguel A. Torres Reyes, Agte. Manuel Nazario Pacheco, Agte. Luis Echevarría Medina, Agte. Aileen Rodríguez Oquendo y el Agte. Gaspar Pellicier Bahamundi. Véase, *Minuta* de 17 de julio de 2023, Autos Originales y el Tomo IV de la Transcripción de la Prueba Oral, págs. 1169-1170.

Napoleoni y la señora Napoleoni Medina de todos los cargos imputados.[14] En consecuencia, el 6 de septiembre de 2023, los condenó a extinguir las siguientes **sentencias carcelarias de 139 años**:[15]

### Jeromy Pietri Napoleoni

| | | |
|---|---|---|
| Art. 93(a) Código Penal J VI2023G0006 | 99 años | Concurrente |
| Tentativa Art. 93(a) Código Penal J VI2023G0007 | 10 años | Concurrente |
| Art. 6.05 Ley de Armas J LA2023G0015 | 20 años[16] | Consecutivo |
| Art. 6.14(a) Ley de Armas J LA2023G0016 | 10 años[17] | Consecutivo |
| Art. 6.14(b) Ley de Armas J LA2023G0017 | 10 años[18] | Consecutivo |
| Art. 190(c) Código Penal J BD2023G0010 | 25 años | Concurrente |
| Art. 190(c) Código Penal J BD2023G0011 | 25 años | Concurrente |

### Ana Inés Napoleoni Medina

| | | |
|---|---|---|
| Art. 93(a) Código Penal J VI2023G0008 | 99 años | Concurrente |
| Tentativa Art. 93(a) Código Penal J VI2023G0009 | 20 años | Concurrente |

---

[14] Refiérase al Tomo IV de la Transcripción de la Prueba Oral, págs. 1184-1185.

[15] En el caso J VI2023G0006 del señor Pietri Napoleoni, se emitieron *Sentencia Enmendada* y *Segunda Sentencia Enmendada* el 7 y 12 de septiembre de 2023, respectivamente, a los fines de corregir el apellido del acusado y eliminar un número de caso en el texto. Véase, Autos Originales y Apéndice KLAN202300886, pág. 1. Además, el 8 de septiembre de 2023, se dictaron *Sentencias Enmendadas* en los casos J VI2023G0007, J LA2023G0015 y J LA2023G0016 a los fines de corregir el apellido del acusado. Apéndice KLAN202300886, págs. 2-4. En la misma fecha, se emitieron *Sentencias Enmendadas* para corregir los respectivos delitos imputados en los casos J LA2023G0017, J BD2023G0010 y J BD2023G0011. Apéndice KLAN202300886, págs. 5-7.

Con respecto a la señora Napoleoni Medina, el 6 de septiembre de 2023, se dictaron las respectivas *Sentencias* en los casos J VI20230008, J VI20230009, J BD2023G0012 J BD2023G0013, J FJ2023G0002 y J LA2023G0020. Apéndice KLAN202300887, págs. 1-10; 17-18. Además, se emitieron dos *Sentencias Enmendadas* el 11 de septiembre de 2023 en los casos J LA2023G0018 y J LA2023G0019 para corregir el delito de acusación. Refiérase a los correspondientes Autos Originales.

[16] Aplicación del Artículo 6.01, *Agravamiento de las Penas*, de la Ley de Armas de 2020, 25 LPRA sec. 466.

[17] *Id.*

[18] *Id.*

| Delito | Pena | Tipo |
|---|---|---|
| Art. 6.14(a)<br>Ley de Armas<br>J LA2023G0018 | 10 años[19] | Consecutivo |
| Art. 6.14(b)<br>Ley de Armas<br>J LA2023G0019 | 10 años[20] | Consecutivo |
| Art. 6.05<br>Ley de Armas<br>J LA2023G0020 | 20 años[21] | Consecutivo |
| Art. 190<br>Código Penal<br>J BD2023G0012 | 25 años | Concurrente |
| Art. 190<br>Código Penal<br>J BD2023G0013 | 25 años | Concurrente |
| Art. 283<br>Código Penal<br>J FJ2023G0002 | 8 años | Concurrente |

Inconforme con el resultado, el 4 de octubre de 2023, el señor Pietri Napoleoni presentó un *Escrito de Apelación* y señaló la comisión de los siguientes errores:

**KLAN202300886**

PRIMERO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR AL AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO EN SU INCISO A, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE EL COMPARECIENTE INCURRIERA EN ALGÚN ACTO DELICTIVO POR MEDIO DE VENENO, ACECHO, TORTURA O A PROPÓSITO O CON CONOCIMIENTO.

SEGUNDO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR AL AQUÍ APELANTE CULPABLE POR TODOS LOS DELITOS IMPUTADOS, CUANDO LA PRUEBA DEL ESTADO NUNCA CUMPLIÓ CON LOS ELEMENTOS DE LOS DELITOS REQUERIDOS RESPECTIVAMENTE, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

TERCERO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR AL AQUÍ APELANTE CULPABLE POR TODOS LOS DELITOS IMPUTADOS, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE EL COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

CUARTO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR AL AQUÍ APELANTE CULPABLE POR TODOS LOS DELITOS IMPUTADOS, A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

QUINTO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DIRIMIR LA PRUEBA RELATIVA A LAS CAUSAS PENALES DEL TÍTULO A FAVOR DE LA TEORÍA DEL MINISTERIO PÚBLICO, NO EMPECE A QUE LA MISMA FUE INSUFICIENTE, INVEROSÍMIL, ALTAMENTE CONFLICTIVA Y CONTRADICTORIA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

Por otra parte, la señora Napoleoni Medina instó una *Apelación Criminal* el 4 de octubre de 2023 y esbozó los siguientes errores:

**KLAN202300887**

PRIMERO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIERA DOMINIO DEL HECHO DELICTIVO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

SEGUNDO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE FUERA AUTORA Y/O COAUTORA Y/O COOPERADORA DE DICHO DELITO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

TERCERO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE FUERA AUTORA DIRECTA INDIVIDUAL DE DICHO DELITO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

CUARTO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE FUERA AUTORA MEDIATA DE DICHO DELITO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

QUINTO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE PARTICIPACIÓN ALGUNA EN EL HECHO DELICTIVO MEDIANTE INDUCCIÓN DE DICHO DELITO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

SEXTO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A

LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE PARTICIPACIÓN ALGUNA EN EL HECHO DELICTIVO MEDIANTE INDUCCIÓN DE DICHO DELITO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

SÉPTIMO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UNA PARTICIPACIÓN EN EL CASO QUE CONSTITUYESE UN ESLABÓN EN EL ACONTECER DELICTIVO QUE CULMINÓ EN LA MUERTE DE JANCARLO RIVERA LUGO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

OCTAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UNA INTERVENCIÓN QUE CONSTITUYERA SER UNA DE COAUTORÍA DIRECTA CONJUNTA EN LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

NOVENO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UNA INTERVENCIÓN QUE CONSTITUYERA SER UNA DE COOPERACIÓN NECESARIA EN LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

DÉCIMO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UNA INTERVENCIÓN QUE CONSTITUYERA SER, CONFORME A LA TEORÍA DEL MINISTERIO PÚBLICO, UNA EN LA CUAL SE CONFIGURA EL REQUISITO DE LA CONCURRENCIA DE LA COAUTORÍA EN LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO Y/O DE CUALQUIER OTRA MANERA, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

ONCEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UNA INTERVENCIÓN QUE CONSTITUYERA OBLIGAR A UN TERCERO MEDIANTE EL USO DE FUERZA FÍSICA IRRESISTIBLE Y/O DE CUALQUIER OTRA MANERA Y QUE ELLO LLEVÓ LOS ACONTECIMIENTOS QUE

CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

DOCEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL POR DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE TUVIESE UN DEBER DE GARANTE EN RELACIÓN A LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

TRECEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE CONSTITUYERA SER PARTICIPE Y/O QUE CONTRIBUYÓ INTENCIONALMENTE A UN HECHO ANTIJURIDICO AJENO, Y ESTO EN RELACIÓN A LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

CATORCEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE ASESINATO EN PRIMER GRADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A LOS ACONTECIMIENTOS QUE CULMINARON EN LA MUERTE DE JANCARLO RIVERA LUGO, CONFORME A NUESTRO ORDENAMIENTO JURÍDICO.

QUINCEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE TENTATIVA DE ASESINATO EN PRIMER GRADO (CASO J VI2023G0009), CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

DIECISEISAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE POR EL DELITO DE TENTATIVA DE ASESINATO EN PRIMER GRADO (CASO J VI2023G0009), A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

DIECISIETEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J FJ2023G0002 POR EL DELITO DE AMENAZA O INTIMIDACIÓN A TESTIGOS, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

DIECIOCHOAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL

DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J FJ2023G0002 POR EL DELITO DE AMENAZA O INTIMIDACIÓN A TESTIGOS, A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

DIECINUEVEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0018 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.14 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

VEINTEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0018 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.14 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

VEINTIUNOAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0019 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.14 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

VEINTIDOSAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0019 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.14 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

VEINTITRESAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0020 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.05 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

VEINTICUATROAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J LA2023G0020 POR EL DELITO DE INFRACCIÓN AL ARTÍCULO 6.05 DE LA "LEY DE ARMAS DE PUERTO RICO DE 2020", A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA

RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

VEINTICINCOAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J BD2023G0012 POR EL DELITO DE ROBO AGRAVADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

VEITISEISAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J BD2023G0012 POR EL DELITO DE ROBO AGRAVADO, A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

VEINTISIETEAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J BD2023G0013 POR EL DELITO DE ROBO AGRAVADO, CUANDO LA PRUEBA DEL ESTADO NUNCA DEMOSTRÓ QUE LA COMPARECIENTE HAYA ACTUADO A PROPÓSITO Y/O CON CONOCIMIENTO Y/O TEMERARIAMENTE EN RELACIÓN A DICHO EVENTO.

VEINTIOCHOAVO: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE, AL DECLARAR A LA AQUÍ APELANTE CULPABLE EN EL CASO J BD2023G0013 POR EL DELITO DE ROBO AGRAVADO, A PESAR DE QUE LA PRUEBA DE CARGO NO ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE Y FUNDADA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

VEINTINUEVEAVO: ERRÓ EL TRIBUNAL DE INSTANCIA, SALA SUPERIOR DE PONCE AL DIRIMIR LA PRUEBA RELATIVA A LAS CAUSAS PENALES DEL TÍTULO A FAVOR DE LA TEORÍA DEL MINISTERIO PÚBLICO, NO EMPECE A QUE LA MISMA FUE INSUFICIENTE, INVEROSÍMIL, ALTAMENTE CONFLICTIVA Y CONTRADICTORIA, EN VIOLACIÓN AL DERECHO CONSTITUCIONAL DEL DEBIDO PROCESO DE LEY.

TREINTAVO: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE PONCE AL ADMITIR LA IDENTIFICACIÓN DE LA APELANTE CUANDO LA MISMA NO FUE CONFORME A DERECHO.

Mediante nuestra *Resolución* de 11 de enero de 2024, a petición de parte, **consolidamos ambas causas**. Posteriormente, el 28 de mayo de 2024, las partes apelantes presentaron sendos alegatos suplementarios. Asimismo, el 26 de agosto de 2024, se perfeccionaron ambos casos con el *Alegato de El Pueblo de Puerto*

*Rico.* Con el beneficio de sus comparecencias, los Autos Originales y la Transcripción de la Prueba Oral estipulada, podemos resolver.

**II.**

**A.**

**(i)**

La Constitución de Puerto Rico establece como derecho fundamental que a toda persona acusada de delito le cobija la presunción de inocencia. Art. II, Sec. 11, Const. PR, LPRA Tomo 1. Por consiguiente, para emitir un fallo de culpabilidad, el Ministerio Público tiene la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito y su conexión con la persona acusada. *Pueblo v. Toro Martínez,* 200 DPR 834; 856 (2018); *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.,* 176 DPR 133, 143 (2009). Claro, lo anterior no equivale a que se tenga que probar la culpabilidad del acusado con certeza matemática. *Pueblo v. Toro Martínez, supra,* pág. 856; *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 71 (1991). Para determinar que la prueba controvierte la presunción de inocencia, se exige prueba satisfactoria y suficiente en derecho. *Pueblo v. Toro Martínez, supra,* pág. 856; *Pueblo v. García Colón I, supra,* págs. 174-175. Esto es, la norma de suficiencia de la prueba, según la Regla 110 de Procedimiento Criminal,[22] conlleva que se absuelva al acusado si existe duda razonable luego de un estudio de la totalidad de la evidencia. La prueba que justifique una convicción tiene que ser satisfactoria, de modo que "produzca la certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Acevedo Estrada,* 150 DPR 84, 100 (2000). Esto significa que, si la prueba admitida por el acusador produce insatisfacción en el ánimo del juzgador, entonces, existe duda

---

[22] 34 LPRA Ap. II, R. 110.

razonable y fundada. *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En atención a este principio, los foros apelativos debemos tener la misma satisfacción y tranquilidad al evaluar la prueba en su totalidad. *Pueblo v. Casillas, Torres*, 190 DPR 398, 415 (2014); *Pueblo v. Colón Burgos*, 140 DPR 564, 581 (1996).

Como se sabe, la presunción de inocencia asiste al acusado hasta el fallo de culpabilidad. En los remedios postsentencia, la carga de persuadir al tribunal recae en el acusado. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ed. Situm, 2018, Sec. 4.3, pág. 154. "Recordemos que con el fallo de culpabilidad —mediante el cual se entenderán probados los delitos imputados más allá de duda razonable— acaba la presunción de inocencia y nace la presunción de corrección del dictamen". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 149 (2020). Esto es así, porque la apreciación imparcial de la prueba que hagan los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Rosario Cintrón*, 102 DPR 82, 83 (1974).

Además, las determinaciones de hechos probados que hizo el juzgador primario no se deben descartar arbitrariamente, a menos que, de la prueba admitida, surja que no existe base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada, supra*, pág. 99. A tales efectos, sólo cederá la deferencia en etapa apelativa si: (1) hubo prejuicio, parcialidad o pasión, o (2) la prueba no concuerda con la realidad fáctica, es increíble o imposible. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 481 (2013). A estos fines, queda claro que la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es un asunto de hecho y derecho, revisable en apelación. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 472 (1988).

**(ii)**

De otro lado, se conoce que nuestro esquema probatorio está revestido de deferencia a las determinaciones que hacen los juzgadores de primera instancia en cuanto a la prueba testifical, ya que ese foro está en mejor posición para aquilatarla. *Pueblo v. De Jesús Mercado, supra,* págs. 477-478. Así ha opinado nuestro alto foro:

> Como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad para sustituir las determinaciones del foro primario por sus propias apreciaciones. Este Tribunal ha reafirmado que las determinaciones de hechos del Tribunal de Primera Instancia a las que sustente prueba oral merecen gran deferencia de los tribunales apelativos. Ese axioma está basado en consideraciones lógicas, ya que el magistrado del foro primario es quien ha tenido la oportunidad de contactar directamente ese tipo de prueba. *Id.*, pág. 478. (Citas suprimidas).

Al respecto, el Tribunal Supremo ha acotado que es "[e]l juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". *Pueblo v. García Colón I, supra,* pág. 165. Es de esta manera, porque

> [t]ambién hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y, sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1975).

Por ende, cuando convergen asuntos de suficiencia de la prueba y deferencia en cuanto a la apreciación de la prueba testifical, como foro apelativo, nos corresponde examinar si la

determinación de credibilidad del foro de instancia rebasó los límites de la sana discreción judicial. Véase, *Pueblo v. De Jesús Mercado*, *supra*, pág. 484.

**B.**

**(i)**

El Artículo 92, *Asesinato*, del Código Penal de 2012 define el delito como el acto de "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141. En cuanto al *Asesinato en Primer Grado*, el Inciso (a) del Artículo 93, *Grados de Asesinato*, del Código Penal, 33 LPRA sec. 5142, dispone que "[t]odo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento" constituye el delito de *Asesinato en Primer Grado*. Es decir, "[l]os hechos sancionados en las leyes penales requieren que se actúe a propósito, con conocimiento o temerariamente, salvo que expresamente se indique que baste actuar negligentemente". Art. 23 (a) del Cód. Penal, 33 LPRA sec. 5036 (a).

Conforme con el ordenamiento penal, la *intención* es equivalente a actuar *a propósito, con conocimiento* o *temerariamente*. Art. 14 del Cód. Penal, 33 LPRA sec. 5014(z.1). "Una persona actúa a propósito cuando el objetivo consciente de la persona es cometer el delito". Art. 14 del Cód. Penal, 33 LPRA sec. 5014(kk). Asimismo, *a sabiendas* es sinónimo de la frase *con conocimiento*. Art. 14 del Cód. Penal, 33 LPRA sec. 5014(a).

Además, el Código Penal de 2012 establece expresamente las formas de culpabilidad y los elementos subjetivos del delito:

> **Artículo 21. Formas de culpabilidad: Requisito general del elemento subjetivo.**
>
> (a) Una persona solamente puede ser sancionada penalmente si actuó a propósito, con conocimiento, temerariamente o negligentemente con relación a un resultado o circunstancia prohibida por ley.

(b) El elemento subjetivo del delito se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona. 33 LPRA sec. 5034.

**Artículo 22. Elementos subjetivos del delito.**

Elementos subjetivos del delito.

(1) A propósito

(a) con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado.

(b) con relación a una circunstancia, una persona actúa "a propósito" cuando la persona cree que la circunstancia existe.

(2) Con conocimiento

(a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.

(b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura.

(3) Temerariamente

Una persona actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia prohibida por ley. 33 LPRA sec. 5035.

. . . . . . . .

En cuanto a lo citado, la doctrina ha expresado que existen tres distintas formas o modalidades de la intención: (1) propósito, (2) conocimiento y (3) temeridad. En términos generales, un sujeto actúa a "propósito" cuando su objetivo es cometer el delito. De otra parte, el autor actúa "con conocimiento" cuando sabe que la comisión del delito es una consecuencia necesaria de sus actos. Por otro lado, un sujeto actúa "temerariamente" cuando es consciente de que su conducta crea un riesgo injustificado de producir un delito". L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, Publicaciones JTS, 2da ed., 2013, págs. 152-153.

Asimismo, para que se configure la intención no se requiere de una previa planificación ni de que se conciba con mucho tiempo de antelación a los hechos. Ésta puede formarse unos minutos previo a su ejecución. *Pueblo v. Echevarría Rodríguez I*, 128 DPR

299, 368 (1991). En suma, se comete asesinato en primer grado cuando *a propósito* se da muerte a un ser humano. Es decir, cuando "la persona tiene un deseo específico de efectuar el acto y quiere producir el resultado, ratificándolo con su actuación". *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 248-249 (2011).

### (ii)

El Artículo 35 del Código Penal de 2012, 33 LPRA sec. 5048, define la tentativa "[...] cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad". Véase, *Pueblo v. Carmona, Rivera*, 143 DPR 907, 914 (1997). En otras palabras, con la tentativa hay "ausencia de lo que generalmente se considera el resultado dañino de una determinada conducta delictiva". D. Nevares-Muñiz, *Derecho Penal Puertorriqueño. Parte General*, 7ma ed. rev. San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 318. La profesora Nevares Muñiz enumera los requisitos del tipo de delito:

> 1) la realización de una acción u omisión;
> 2) a propósito o con conocimiento y de forma inequívoca —sin duda alguna— a cometer un delito;
> 3) que constituya la fase inmediatamente anterior o el primero de los actos exigidos por el tipo; y
> 4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad del actor. [...]
> .    .    .    .    .    .    .    .
>
> [L]os actos deben conducir el resultado conforme la intención o propósito del autor [...]. D. Nevares Muñiz, *Código Penal de Puerto Rico*, 3ra ed. rev. y actualizada, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, págs. 70-71. (Citas suprimidas).

De otra parte, el Artículo 36 del Código Penal, 33 LPRA sec. 5049, apareja la pena a imponer en los casos de tentativa:

> Toda tentativa de delito grave conlleva una pena igual a la mitad de la pena señalada para el delito consumado, no pudiendo exceder de diez (10) años la pena máxima de la tentativa. Toda tentativa de delito que conlleve una pena de reclusión por un término fijo de noventa y

nueve (99) años, conlleva una pena de reclusión por un término fijo de veinte (20) años.

### (iii)

El Artículo 189, *Robo*, del Código Penal de 2012, 33 LPRA sec. 5259, establece que una persona comete el delito de robo cuando "se apropie ilegalmente de bienes muebles pertenecientes a otra, sustrayéndolos de la persona en su inmediata presencia y contra su voluntad, por medio de violencia o intimidación, [...]". La sanción penal es de 15 años. *Id.*

No obstante lo anterior, de conformidad con el Inciso (c) del Artículo 190, *Robo Agravado*, del Código Penal, 33 LPRA sec. 5260, si en la comisión del delito de robo se le inflige daño físico a la víctima, se configuran los elementos para ser clasificado como un robo agravado, con una pena fija de 25 años de cárcel.

### (iv)

El Artículo 283, *Amenaza o intimidación a testigos*, del Código Penal de 2012, 33 LPRA sec. 5376, establece en su parte pertinente:

> Toda persona que amenace con causar daño físico a una persona, [...], o incurra en conducta que constituya intimidación o amenaza, ya sea física, escrita, verbal, o no-verbal, cuando dicha persona sea testigo o por su conocimiento de los hechos pudiera ser llamado a prestar testimonio en cualquier investigación, procedimiento, vista o asunto judicial, [...], que hubiese o no comenzado, [...], con el propósito de que no ofrezca su testimonio, lo preste parcialmente o varíe el mismo, será sancionada con pena de reclusión por un término fijo de ocho (8) años. [...]

### C.

### (i)

El Artículo 6.05 de la Ley de Armas de 2020, 25 LPRA sec. 466d, tipifica como delito la portación, transportación o uso de armas de fuego sin licencia. En particular, el estatuto dispone:

> Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin

derecho a sentencia suspendida, a, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.

Así, pues, se incurre en la infracción a la Ley de Armas si se porta o usa un arma sin licencia. El término *portación* significa "la posesión inmediata o la tenencia física de una o más armas de fuego, cargadas o descargadas, sobre la persona del portador o a su alcance inmediato. Por alcance inmediato se entenderá al alcance de su mano y la transportación de las mismas". Art. 1.02 de la Ley de Armas, 25 LPRA sec. 461a(gg).

**(ii)**

En lo que concierne al caso de autos, las modalidades del Artículo 6.14 de la Ley de Armas de 2020, 25 LPRA sec. 466m, establecen lo siguiente:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
>
> (a) voluntariamente dispare cualquier arma de fuego fuera de los lugares autorizados por esta Ley, aunque no le cause daño a persona alguna; o
>
> (b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.
>
> .    .    .    .    .    .    .    .

Según se desprende del precitado articulado, se tipifican dos conductas distintas: apuntar un arma de fuego y disparar un arma de fuego. Además, para que se entiendan configurados los delitos, al acto de apuntar o disparar, se suma la concurrencia del elemento subjetivo y las demás circunstancias para ello. A saber, en el Inciso (a), el elemento de temeridad, disparar y que el acto se cometa fuera de los lugares autorizados. En el Inciso (b), el elemento intencional y apuntar a una persona. Finalmente, la pena que apareja la

conducta proscrita es de cinco años, sujeta a la aplicación del Artículo 6.01 de la Ley de Armas, *infra*.

**(iii)**

El Artículo 6.01 de la Ley de Armas de 2020, 25 LPRA sec. 466, *Agravamiento de las Penas*, dispone que si se "usare un arma en la comisión de cualquier delito y como resultado de tal violación, alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará". En atención al articulado predecesor, la penalidad ha superado el crisol de nuestro Tribunal Supremo. Véase, *Pueblo v. Concepción Guerra*, 194 DPR 291 (2015).

**D.**

La Regla 43 de Procedimiento Criminal, *Alegaciones en cuanto a Coautores o Cooperadores*, 34 LPRA Ap. II, R. 43, indica que, cuando a la persona acusada se le impute ser autor o cooperador en la comisión de un delito, "por haber ayudado, forzado, inducido provocado, instigado o cooperado a su comisión, no será necesario hacer en cuanto a ellos más alegaciones que las requeridas contra el principal o autor personal de los hechos".

Por su parte, el Código Penal de 2012 dispone sobre la responsabilidad, la coautoría y la cooperación en la comisión de los actos delictivos. En particular, los Artículos 43, 44 y 45 del aludido cuerpo legal, 33 LPRA secs. 5066-5068, establecen lo siguiente:

**Artículo 43. Personas responsables.**

Son responsables de delito los autores, sean personas naturales o jurídicas.

**Artículo 44. Autores.**

Se consideran autores:

(a) Los que toman parte directa en la comisión del delito.

(b) Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.

(c) Los que se valen de una persona inimputable para cometer el delito.

(d) Los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo.

(e) Los que se valen de una persona jurídica para cometer el delito.

(f) Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.

(g) Los que a propósito ayudan o fomentan a que otro lleve a cabo conducta que culmina en la producción de un resultado prohibido por ley, siempre que actúen con el estado mental requerido por el delito imputado con relación al resultado.

**Artículo 45. Cooperador.**

Son cooperadores los que, con conocimiento, cooperan mediante actos u omisiones que no contribuyen significativamente a la consumación del delito.

Al cooperador se le impondrá una pena equivalente a la mitad de la pena del autor, hasta un máximo de diez (10) años.

El ordenamiento penal sustantivo, pues, distingue el cooperador del autor a base de lo significativo que sean los actos contribuyentes para la consumación del delito. A esos fines, una cooperación que no contribuya de manera significativa se sanciona con una pena igual a la mitad de la pena del autor, hasta un máximo de diez (10) años. Ahora, si las actuaciones cooperadoras, a propósito o con conocimiento, contribuyen significativamente a la comisión del delito, se considera como autor del hecho delictivo de conformidad con el Inciso (d) del Artículo 44, *supra.* Asimismo, según rezan los Incisos (b), (d) y (g) del referido articulado, se considera autor a quien —con el estado mental requerido— solicita, provoca o induce a otra persona a cometer el delito; así como los que, mediante actos anteriores, coetáneos y posteriores, ayudan o fomentan que otro lleve a cabo una conducta que culmina en la producción de un resultado prohibido por ley. La inducción es un

tipo de participación que consiste en provocar intencionalmente a otro a cometer un delito y, en nuestro ordenamiento, ese tipo de participación es punible. L.E. Chiesa, *Autores y Cooperadores*, Revista Jurídica UPR, Vol. 79, Núm. 4 (2010) pág. 1170. Es decir, tanto al inductor como al cooperador necesario se le suele castigar como si fuera el autor. *Id.*, pág. 1169.

> [E]n casos de coautoría puede decirse que cada uno de los interventores retiene en sus manos el dominio del hecho, pues las contribuciones de cada uno resultan esenciales para la consecución del objetivo delictivo. Por tanto, el control sobre el hecho se comparte, ya que si uno de los interventores no contribuye según lo acordado, no podrá consumarse el delito. Sin embargo, se entiende que no son autores los que contribuyen a la comisión del hecho delictivo en circunstancias en que no tienen dominio del mismo. El que ayuda a cometer el delito en estas circunstancias colabora en un hecho delictivo ajeno. *Id.*, pág. 1165.

En suma, los coautores son aquellas personas que participan consciente e intencionalmente en la comisión de un delito. Además, es necesario probar que los autores actuaron en concierto y común acuerdo. Es decir, se requiere establecer algún grado de consejo, incitación o participación directa o indirecta en el hecho punible. *Pueblo v. Sustache Sustache*, 176 DPR 250, 301 (2009).

**III.**

En las causas del título, el señor Pietri Napoleoni alega que no se configuró un asesinato en primer grado. En la alternativa, sostiene que, con el objetivo de asistir a su madre, en un estado de emergencia, portó un arma que, en un breve lapso, se disparó luego que Jancarlo Rivera Lugo golpeara la punta del arma. Por consiguiente, aduce la configuración de los delitos de asesinato atenuado o asesinato en segundo grado. Con relación a los otros delitos imputados; a saber: la tentativa de asesinato en primer grado, los dos cargos por robo agravado y la trilogía de infracciones a la Ley de Armas de 2020, indica que la evidencia no estableció la culpabilidad más allá de duda razonable. Añade que la evidencia fue

insuficiente y conflictiva. En particular alude a ciertas contradicciones en los testimonios de Luis Manuel Báez y Jineyshka Cruz Bonilla.

Por otra parte, en la treintena de señalamientos de error, en síntesis, la señora Napoleoni Medina plantea que su culpabilidad no se probó más allá de duda razonable. Apunta sobre la ausencia de prueba fehaciente que la señale como autora, coautora o cooperadora de los delitos imputados ni de cómo pudo haber inducido o contribuido de manera esencial a la comisión del asesinato de Jancarlo Rivera Lugo, por lo que cuestiona la suficiencia de la evidencia. Ello así, al aseverar que el autor directo del crimen fatal fue su hijo, el señor Pietri Napoleoni, a quien inculpa también del delito de tentativa de asesinato y las infracciones a la Ley de Armas de 2020, al ser éste quien portó, apuntó y disparó el arma de fuego.

Por igual, indica que hay prueba contradictoria entre los testimonios de Luis Manuel Báez y Jineyshka Cruz Bonilla. Por ejemplo, la presencia de tres individuos armados o quién, si alguien, ordenó a la pareja a detenerse; así como la apreciación del señor Báez, quien no vio a la apelante en el momento de la detonación. En cuanto al testimonio de la víctima sobreviviente y testigo ocular, señala ciertas inconsistencias entre las declaraciones ofrecidas por la señora Cruz Bonilla a la Policía; y el uso de notas policiacas cuando ésta prestó su declaración jurada. Además, postula que la grabación del Sistema 911 no recoge la amenaza atribuida y que el Ministerio Público no presentó un caso de asesinato estatutario, por cuanto razona que no se demostró la comisión de los delitos de amenaza ni robo agravado. Aboga por que la alegada sustracción de los teléfonos celulares de las víctimas responde más bien a los delitos de encubrimiento y destrucción de pruebas. Por último,

cuestiona la identificación de la señora Napoleoni Medina por presuntamente no haberse realizado conforme a derecho.

**(i)**

Como cuestión de umbral, atenderemos el señalamiento de error relacionado con la identificación de la señora Napoleoni Medina.

Surge de los Autos Originales que, el 28 de abril de 2023, a base de la descripción ofrecida por la señora Cruz Bonilla y el procedimiento de identificación de fotografías, la apelante solicitó la inadmisión de la identificación por no ser confiable ni haberse observado los requisitos de ley. En específico, apostilló que la identificación fue sugestiva. Dijo que la descripción fue general, vaga y no mostró rasgos de identidad, en alusión a que la testigo describió a una mujer bajita, gordita, achinada, cachetona, blanquita con el pelo rubio castaño y puntas negras. Afirmó que las fotografías presentadas no cumplieron con la descripción que dio la testigo, por lo que el proceso se tornó sugestivo.[23]

El Ministerio Público compareció con su oposición el 4 de mayo de 2023. Adujo que la testigo tuvo cerca a la apelante en varias ocasiones, toda vez que fue ella quien increpó y agredió al occiso. Luego, la observó llamar por teléfono, reírse cuando el señor Pietri Napoleoni le disparó a Jancarlo Rivera Lugo y; finalmente, la vio sustraer los teléfonos y amenazarla con que, si decía algo, la iba a mandar a matar. El Ministerio Público sostuvo que la identificación por fotografía cumplió con los rigores legales de oportunidad de la testigo para observar a la apelante, su grado de atención, la correcta y detallada descripción de la señora Napoleoni Medina el mismo día de los hechos y la certeza en la identificación de su fotografía unos días después de la comisión de los delitos imputados a la apelante.[24]

---

[23] Véase, Autos Originales.
[24] *Id.*

La vista de supresión se celebró el 11 y 15 de mayo de 2023, ocasión en que declararon la señora Cruz Bonilla y el agente García Rivas y se admitieron varias piezas de evidencia documental, entre éstas, las *Actas sobre Confrontación Fotográfica* impugnadas.[25] El TPI dictó *Resolución* el 15 de mayo de 2023 y declaró no ha lugar la solicitud de supresión.[26] Conforme su juicio y contrario a lo alegado, el TPI consignó que, de las declaraciones vertidas, no se desprendía que el agente García Rivas obrara de manera sugerente con respecto a la fotografía de la apelante; así como que la señora Cruz Bonilla demostró absoluta certeza al llevar a cabo la identificación. —"[E]sa cara nunca se le iba a olvidar"— se expresó en el dictamen interlocutorio.[27]

Es meritorio mencionar que la decisión judicial no fue impugnada ante este foro intermedio.

En torno a este asunto, durante el juicio en su fondo, el agente García Rivas declaró que el 14 de noviembre de 2022 hubo una llamada al 911 a las 4:42 de la tarde; y a las 6:20 entrevistó preliminarmente a la señora Cruz Bonilla en el hospital, ocasión en que ésta le brindó su versión de los hechos, incluyendo la descripción de la casa del portón escarlata.[28] En general, la señora Cruz Bonilla describió a la apelante como gordita, bajita, pelo rubio castaño, cachetona, ojos achinados, pero no se refirió a su edad ni a sus tatuajes.[29]

A base de lo anterior, el agente García Rivas se trasladó a la escena en El Tuque. Allí, el agente Luis Echevarría Medina, quien custodiaba la escena, le dijo que conocía a "la Señora que vivía allí",

---

[25] Refiérase a las correspondientes *Minutas* en los Autos Originales.
[26] Véase, Autos Originales.
[27] Refiérase a la Transcripción de la Prueba Oral (TPO), T. II págs. 366 líneas 18-19; 367 líneas 1-15.
[28] TPO, T. II págs. 315 líneas 13-14; 316 líneas 11-18; véase también las págs. 317-321.
[29] TPO, T. II págs. 517-524; T. IV pág. 1178 líneas 11-17. Según el Exhibit 26 estipulado, *Mugshot Profile*, la señora Napoleoni Medina tiene, al menos, un tatuaje en la muñeca y el tobillo.

en referencia a la residencia D105, ya que él había intervenido anteriormente con ésta. El agente Gaspar Pellicier Bahamundi, por su parte, también conocía de vista a la apelante y la describió como gordita, de pelo rubio.[30] El testigo indicó que realizó la búsqueda por varios sistemas y obtuvo un *Mugshot Profile* de la señora Napoleoni Medina (Exhibit 26 estipulado), a quien identificó en Sala.[31] El agente García Rivas declaró que, a pesar de la presencia policial durante el transcurso de la semana que siguió a los hechos, no se logró dar con el paradero de ninguno de los apelantes.[32] Por lo tanto, se realizó una rueda de confrontación fotográfica.[33]

En lo pertinente, el agente García Rivas postuló que la División de Servicios Técnicos confeccionó una rueda de confrontación para la identificación de la señora Napoleoni Medina.[34] Explicó que en el proceso participó la Agte. Aileen Rodríguez Oquendo, ya que entre ambos escogieron las nueve fotografías.[35] El testigo apuntó que, en el caso de Ana Napoleoni, buscaron características que fueran bastante similares.[36]

> P. Bien. Y entonces, una vez culminó, verdad, esa identificación del [s]eñor Jeromy Pietri Napoleoni, ¿cuál fue el próximo muestrario que usted, verdad, le mostró a la testigo?
>
> R. Sí. El próximo, este, que se le muestra es el de Ana Inés.
>
> P. Bien. Explíquele ese procedimiento al Señor Juez.
>
> R. Sí...
>
> P. ¿Cómo fue?
>
> R. [...] se le van a mostrar un cartón donde, pues, como se le hizo con el primero, donde hay nueve (9) fotos, eh, de personas, este, que de... y ella, pues, identificó la número cuatro (4) como la, este, la [s]eñora que estaba

---

[30] TPO, T. II págs. 322-323. Surge de los Autos Originales que la residencia de la apelante es el número D-105 de la calle 8B, en el Barrio Nueva Vida, El Tuque, Ponce.
[31] TPO, T. II págs. 329 líneas 17-19; 330 líneas 6-7; 333 líneas 17-19; 334 líneas 1-2.
[32] TPO, T. II T. II pág. 342 líneas 10-18.
[33] TPO, T. II pág. 343.
[34] TPO, T. II págs. 352 líneas 1-15; 355. Además, TPO, T. III págs. 663-706.
[35] TPO, T. II págs. 354 líneas 18-19; 355-356; además, Exhibit 2 del Ministerio Público. Véase, además, T. II págs. 466-467; 470-473.
[36] TPO, T. II pág. 357 líneas 13-18.

allí que agredió a, a Jancarlo[] y que le quitó, eh, ambos teléfonos.[37]

El procedimiento se realizó el 20 de noviembre de 2022; esto es, a seis días de los hechos delictivos.[38]

Por su parte, la señora Cruz Bonilla testificó que el día de los hechos brindó una descripción de la señora Napoleoni Medina. "No era alta, blanquita, cachetona, 'achiná' [...] pelo rubio castaño con puntas negras". Además, describió la casa donde se internaron los apelantes después del crimen: una casa con un portón de metal con una puerta color escarlata.[39]

El 20 de noviembre de 2022, la perjudicada acudió a la Comandancia de Ponce.[40] Le mostraron cuatro cartones.[41] Primero reconoció al señor Pietri Napoleoni, "al que disparó" y luego a la señora Napoleoni Medina, "la persona que causó 'to' el problema".[42] Según se escuchó en el juicio, durante la Vista Preliminar, la testigo asintió ante la pregunta de la Defensa de que la Policía mencionó que se le entregarían cuatro tarjetas para la identificación de sospechosos.[43] La señora Cruz Bonilla, si bien admitió que, en su declaración jurada, la Policía le había indicado acerca de la identificación de unos "atacantes", negó cualquier sugerencia por parte de las autoridades durante el proceso de identificación.[44] Por tanto, ante la interrogante sobre si tenía alguna duda con la identificación, la señora Cruz Bonilla respondió en la negativa.

> P. Testigo, a preguntas hace un rato del abogado usted indicó que luego que usted testificó en Vista Preliminar en relación a los cartones usted corrigió algo...
> R. Sí.

---

[37] TPO, T. II pág. 366 líneas 5-14.
[38] TPO, T. II pág. 370 líneas 8-17.
[39] TPO, T. III pág. 806 líneas 6-14.
[40] TPO, T. III pág. 807 líneas 5-7.
[41] TPO, T. III pág. 814 líneas 16-18.
[42] TPO, T. III págs. 820-821; 825 y Exhibit 2 del Ministerio Público.
[43] TPO, T. IV págs. 1139-1141.
[44] TPO, T. III págs. 826 líneas 6-12; 866 líneas 13-16; 900 líneas 1-5. En el contrainterrogatorio, la señora Cruz Bonilla aludió a "sospechoso". TPO, T IV pág. 1136 líneas 17-18. Sobre los turnos de contrainterrogatorio, redirecto y recontrainterrogatorio acerca de la identificación de la apelante, refiérase a la TPO, T. IV págs. 1142-1168.

P. ... ¿correcto? ¿Qué fue lo que usted clarificó en la Vista de supresión?

R. Que era solamente un cartel de mujeres.

P. Y en ese cartel usted identificó, ¿a quién?

R. Número cuatro (4).

P. ¿Usted tiene alguna duda con esa identificación?

R. No.

P. A esa persona que usted identificó con la número cuatro (4), ¿dónde se encuentra?

R. Ahí sentada.[45]

Como es sabido, la confiabilidad del procedimiento de identificación se examina a la luz de las circunstancias particulares de cada caso. *Pueblo v. Ortiz Pérez*, 123 DPR 216, 223 (1989), citado en *Pueblo v. Mejías*, 160 DPR 86, 93 (2003). Se ha reiterado en la jurisprudencia que los elementos a considerar son: la oportunidad que tuvo el testigo de observar al acusado en el momento en que ocurre el acto delictivo; el grado de atención del testigo; la corrección de la descripción; el nivel de certeza en la identificación, y el tiempo que transcurrió entre el crimen y la confrontación. *Id.; Pueblo v. Rodríguez Román*, 128 DPR 121, 127 (1991); *Pueblo v. Peterson Pietersz*, 107 DPR 172 (1978). Al respecto, el alto foro ha expresado que, "[c]uando de la totalidad de las circunstancias surja que la identificación tiene suficientes garantías de confiabilidad, ésta debe admitirse". *Pueblo v. Mejías, supra,* pág. 93.

En este caso, somos del criterio que la identificación de la apelante por parte de la señora Cruz Bonilla goza de entera confiabilidad. La testigo y víctima tuvo una amplia oportunidad de observar a la señora Napoleoni Medina desde que ésta intervino con el vehículo del occiso y durante la comisión de los delitos. Es decir, la señora Cruz Bonilla contó con tiempo considerable, estuvo a una distancia apropiada y prestó un grado de atención suficiente para percatarse de la apariencia y los rasgos de la apelante, de manera

---

[45] TPO, T. IV págs. 1165 líneas 14-19; 1166 líneas 1-7.

que pudo describirla y luego identificarla acertadamente en la cuarta fotografía mostrada en el Exhibit 1 del Ministerio Público. Además, cabe destacar que el procedimiento de identificación se llevó a cabo apenas a seis días de acontecidos los aciagos hechos; sin haberse demostrado alguna intervención indebida de sugestión por parte de la Policía capaz de anular la identificación.

En *Pueblo v. Rosso Vázquez*, 105 DPR 905, 908-909 (1977), nuestro Tribunal Supremo señaló que "[e]l procedimiento de identificación mediante fotografías es sostenido a menos que se trate de una situación tan crasamente sugestiva que dé lugar a una identificación errónea. [...] A fin de cuentas, lo importante no es el método que se utilice para la identificación del acusado, lo importante es que la identificación sea libre, espontánea y confiable". Refrendado en *Pueblo v. Mejías*, *supra*. Del mismo modo, la conclusión del juzgador de hechos sobre la confiabilidad de la prueba de identificación de un acusado "tiene todo el respeto y validez que ordinariamente se extiende a las determinaciones de hecho". *Pueblo v. Mejías*, *supra*, pág. 93, que cita con aprobación a *Pueblo v. Ortiz Pérez*, *supra*, págs. 223-224.

En el presente caso, la determinación original del TPI sobre la negativa a suprimir la identificación de la señora Napoleoni Medina no fue objeto de impugnación. Al contrario, la señora Cruz Bonilla reiteró la identificación de la apelante en el juicio en su fondo. En cuanto a esta etapa apelativa, no encontramos indicios de sugestión ni de una falta de confiabilidad como para impugnar la identificación de la apelante por parte de una testigo ocular. Esto es, no existen criterios suficientes en derecho para descartar una identificación fotográfica en un procedimiento libre de sugestión, realizada con seguridad, firmeza y consistencia por una testigo presencial, quien vivió en primera persona la sucesión de crímenes. Así, pues,

resolvemos que los argumentos presentados son inmeritorios y que el error señalado no se cometió.

**(ii)**

Con relación a las contenciones de los apelantes sobre la suficiencia de la prueba en su contra, la existencia de duda razonable y la cuestión de la autoría de los delitos imputados, a continuación, repasamos los testimonios justipreciados por el TPI en el juicio.

### Carlos Alberto Rivera Dávila

El padre de Jancarlo Rivera Lugo indicó que su hijo, de 23 años al momento de su deceso, era Teniente del ejército y estudiante de medicina.[46] El mismo día de los hechos supo que su vástago había sido herido y se encontraba en el hospital.[47] En el hospital advino en conocimiento de su muerte por asesinato.[48] Identificó el Exhibit 17 estipulado, consistente en una copia de una fotografía del occiso ataviado con su uniforme militar.[49]

### Pedro J. Bonilla Laboy

El testigo se ha desempeñado como Investigador Forense en el Instituto de Ciencias Forenses (ICF) por 19 años. Ha trabajado más de 300 escenas de crímenes como Investigador Primario.[50] El 14 de noviembre de 2022, en horas de la tarde, se dirigió a la escena junto al Investigador Auxiliar Harry Natal Rivera, quien documentó las fotos y vídeos.[51] Ésta estuvo custodiada por la Policía, en específico, el agente Luis Echevarría Medina, quien fue el primero en arribar a ella.[52] Allí, el señor Bonilla Laboy observó tres manchas

---

[46] TPO, T. I pág. 12 líneas 13-18.
[47] TPO, T. I pág. 13 líneas 10-15.
[48] TPO, T. I pág. 14 líneas 11-12.
[49] TPO, T. I pág. 15.
[50] TPO, T. I págs. 18 línea 19; 19 líneas 1-5; 22 líneas 3-7.
[51] TPO, T. I. pág. 23.
[52] TPO, T. I págs. 103 líneas 15-17; 127 líneas 3-6, 19; 128 líneas 1-3; 134 líneas 3-11.

de sangre que habían sido lavadas y un proyectil de bala disparado.[53]

El declarante reconoció el *Informe de Hallazgos de Escena*, del cual testificó sobre el croquis incluido en el documento e identificó la localización de la evidencia mencionada.[54] En el lugar, le indicaron que la calle era en una sola dirección, aunque no sabía si la información era o no correcta.[55]

La escena no se reconstruyó. No obstante, en el croquis sí se identificaron algunas residencias de la calle 8B; y se destacó en rojo la que apuntó el agente García Rivas, D-106.[56] Esto porque el oficial del orden público le indicó que el vehículo estuvo más o menos frente a dicha residencia.[57] Aclaró que el vehículo de las víctimas no aparecía en el dibujo, ya que no estaba en la escena en el momento en que lo realizó, sino en el hospital y luego en la Comandancia.[58] El propósito del croquis fue ilustrar lo observado y perpetuar la escena lo más certera posible. El testigo afirmó que realizó un análisis completo de la referida vía.[59] Afirmó que toda la información documentada se hallaba exclusivamente en el *Informe de Hallazgos de Escena*.[60]

El declarante narró que se trasladó al Hospital Damas de Ponce, donde observó el cadáver de Jancarlo Rivera Lugo.[61] Apreció dos heridas: una en el área izquierda del pecho, inferior de la tetilla, en el pectoral, y la otra en el costado derecho.[62] Allí, también hizo un análisis preliminar del vehículo de las víctimas. El Toyota Yaris de 2012 y matrícula IBL-443 tenía una perforación producida por un proyectil de bala disparado en la mica del foco trasero del lado

---

[53] TPO, T. I págs. 27 líneas 5-19; 28 líneas 1-2.
[54] TPO, T. I págs. 31-35.
[55] TPO, T. I. págs. 39 líneas 12-19; 142 líneas 16-19; 143; 144 líneas 1-4.
[56] TPO, T. I págs. 99 líneas 5-11; 100 líneas 15-19; además, Exhibit 22 estipulado.
[57] TPO, T. I págs. 96 líneas 17-19; 97 líneas 1-2.
[58] TPO, T. I págs. 98 líneas 8-11; 165 líneas 15-19; 166 líneas 1-10.
[59] TPO, T. I pág. 160 líneas 5-10.
[60] TPO, T. I págs. 162 líneas 5-14; 163 líneas 6-8.
[61] TPO, T. I pág. 42 líneas 8-13; además, págs. 43 líneas 5-12; 44 líneas 9-13.
[62] TPO, T. I págs. 42 líneas 5-19; 43 líneas 5-12.

derecho y una mancha de aparente sangre en el marco exterior de la puerta delantera del lado derecho.[63] La trayectoria del disparo fue de atrás al frente, de derecha a izquierda, de arriba hacia abajo.[64] El testigo no recordó que las llaves del auto tuvieran como aditamento el frasco de "pepper spray", por lo que no lo documentó a pesar de ser un detalle importante.[65]

### Dr. Francisco Dávila Toro

La capacidad del Patólogo Forense —quien ha ejercido por 20 años y realizado alrededor de 5,000 autopsias— fue estipulada por las partes.[66] En relación con los Exhibits 20 y 27 estipulados,[67] el testigo declaró:

> Según establezco en este informe, el, el examen externo, eh, trata de un cadáver de un varón de la raza blanca, [cuya edad establecida es] de veintitrés (23) años. Se recibe desnudo y lo acompaña una "t-shirt" gris, un pantaloncillo tipo "boxer" gris, un mahón largo azul, una media negra, una correa de cuero negra. Una vez desprovisto de la ropa se apreció un cuerpo en un buen estado de desarrollo que mide sesenta y cuatro (64) pulgadas de estatura y tiene un peso de cuarenta y ocho (48) kilogramos [106 libras]. La cabeza está cubierta por cabello negro y corto[. Las írides de los ojos son] del color marrón claro, las pupilas están simétricamente [dilatadas], las conjuntivas [escleras y córneas] en condición normales, la nariz está en la línea media, el septo está intacto, los labios son simétricos [sin evidencia de] laceraciones o traumas, los [frénulos] orales están intactos, los dientes son permanentes. El cuello presenta [un contorno] adecuado, el tórax es simétrico, [el abdomen es blando a la palpación] y las extremidades superior[es] [e inferiores no presentan evidencia de deformidad o] fractura, la genital[ia externa es la] adecuad[a] para el sexo y la edad.[68]

El galeno identificó una herida de bala localizada en la región del cuadrante superior izquierdo del abdomen; esto es, aproximadamente luego del costal del lado izquierdo.[69] La herida

---

[63] TPO, T. I págs. 45 líneas 11-19; además, 46-48; 71-73; Exhibits 9-14 y 25 estipulados.
[64] TPO, T. I págs. 50 líneas 13-19; 74 líneas 12-16.
[65] TPO, T. I págs. 88-90.
[66] TPO, T. III págs. 736 líneas 1-5; véase, 737 líneas 3-6, 11-18.
[67] TPO, T. III pág. 743 líneas 15-18.
[68] TPO, T. III pág. 744 líneas 8-19 y Exhibit 20, pág. 2.
[69] TPO, T. III pág. 745 líneas 3-16.

presentó un anillo de abrasión y un tatuaje de pólvora de diez pulgadas por siete pulgadas, el cual estimó que fue disparado a una distancia intermedia o seis pies aproximadamente desde el arma de fuego a la superficie corporal.[70] La trayectoria fue de izquierda a derecha y de adelante hacia atrás, un poco hacia abajo.[71] La herida de bala causó fractura en la costilla número ocho anterior del lado izquierdo, perforó el pulmón izquierdo, los lóbulos izquierdo y derecho del hígado, el riñón derecho y las costillas 11 y 12 posteriores derechas. El cuerpo presentó una herida de salida a 40 pulgadas por encima del talón.[72] La herida es compatible con que el occiso estuviera de lado cuando el atacante disparó.[73] Así, pues, concluyó que la causa de muerte fue homicidio por una herida de bala.[74]

### Agte. José García Rivas

Luego de una llamada del Sgto. Miguel Torres Reyes de la División de Homicidios, donde ha laborado casi veinte años, el testigo se dirigió al Hospital Damas de Ponce para comenzar la investigación de una querella sobre un herido de bala originada en el Sistema 911 a las 4:42 de la tarde.[75] Luego de entrevistar a la señora Cruz Bonilla, se dirigió a la escena en la calle 8B.[76] Allí, se identificó en la orilla de la vía un proyectil de bala disparado y tres manchas de sangre. "La última culminaba, prácticamente, frente al portón de la casa de Ana".[77] A su llegada, ya la evidencia estaba marcada.[78] Según el agente García Rivas, las manchas llegaron hasta el portón escarlata de la casa de la apelante porque alguien

---

[70] TPO, T. III pág. 746 líneas 1-16.
[71] TPO, T. III pág. 747 líneas 1-4.
[72] TPO, T. III pág. 748 líneas 2-7.
[73] TPO, T. III pág. 752 líneas 9-13.
[74] TPO, T. III pág. 750 líneas 4-7.
[75] TPO, T. II págs. 308-309; 315 líneas 13-14; 379 líneas 1-7.
[76] TPO, T. II págs. 317-321.
[77] TPO, T. II pág. 322 líneas 5-10.
[78] TPO, T. II pág. 441.

limpió la escena. Pero eso no le constaba ni lo incluyó como parte de sus anotaciones.[79]

Posteriormente, regresó al Hospital Damas junto al personal del ICF.[80] Observó el cadáver de Jancarlo Rivera Lugo en el que identificó dos heridas.[81] Además, realizó una inspección ocular del vehículo Yaris.[82]

El 20 de noviembre de 2022, entrevistó nuevamente a la señora Cruz Bonilla y resumió sus declaraciones.[83] También testificó sobre sus notas de las entrevistas.[84] En cuanto al testigo ocular Luis Manuel Báez, la entrevista se realizó el 11 de enero de 2023.[85]

En el contrainterrogatorio destacó, en parte, en las diferencias de la narración de los hechos de la señora Cruz Bonilla y el señor Báez. En particular, que el señor Báez no declaró sobre tres individuos armados en la cintura sobre los que sí testificó la señora Cruz Bonilla. Aun cuando ambos testigos coincidieron en que la señora Napoleoni Medina dijo: "Por aquí no se baja". El señor Báez no refirió que la apelante haya dicho después: "Ya lo tienes de costumbre".[86] Aun cuando ambos testigos constataron la agresión por parte de la apelante hacia Jancarlo Rivera Lugo, no hubo coincidencia en que la señora Cruz Bonilla dijo que el occiso roció "pepper spray" desde adentro del vehículo; mientras que el señor Báez dijo que el occiso se bajó del auto.[87]

Respecto al asesinato, el agente García Rivas corroboró que, luego que la señora Napoleoni Medina realizara una llamada y dijera

---

[79] TPO, T. II págs. 443-445. Véase, TPO, T. III págs. 724-730. Véase, croquis en el Exhibit 22 estipulado, donde las tres manchas de sangre corresponden a los cuadros amarillos 2, 3 y 4.
[80] TPO, T. II pág. 326 líneas 5-10.
[81] TPO, T. II pág. 329 líneas 4-8.
[82] TPO, T. II pág. 393 líneas 4-8.
[83] TPO, T. II págs. 344 líneas 17-19; 345-349.
[84] TPO, T. II págs. 400-433.
[85] TPO, T. II págs. 402 líneas 15-19; 403 líneas 1-2.
[86] TPO, T. II págs. 406-413; 420-421; 465 líneas 17-18; 539-540.
[87] TPO, T. II págs. 422-426; 558-559.

—Ven acá que me hicieron algo.— el señor Pietri Napoleoni llegó y apuntó a la señora Cruz Bonilla. Jancarlo Rivera Lugo le dio a la punta del arma y se escuchó la detonación.[88] El sonido "pla" del disparo se captó en la llamada del Sistema 911 que realizó la víctima.[89] El agente García Rivas asintió a la pregunta sobre que en la llamada al 911 se escuchó a un hombre desde el lugar de los hechos. La llamada quedó abierta.[90]

Surge, además, que el testigo solicitó y se expidió una orden de registro y allanamiento, la cual diligenció el 15 de noviembre d7e 2022, con el fin de obtener pietaje de unas cámaras en el área. La gestión no rindió evidencia.[91]

Con relación a la declaración jurada que prestó la señora Cruz Bonilla el 22 y 23 de noviembre de 2022, el testigo reconoció que llevó sus notas. Aunque negó que haya ayudado a la testigo, admitió que le refrescó la memoria.[92]

> P. No recuerda si fue una información que ella [la señora Cruz Bonilla] ofreció, que fue distinta a la que usted tenía en las notas del 20 de noviembre...
> R. No.[93]
>
> .    .    .    .    .    .    .    .
>
> P. De... Hablando no del 22, estaba hablando del 22, ahora hablando del 23, del 23. Que usted recuerde, y usted estando presente, ¿usted escuchó que ella [la señora Cruz Bonilla] solicitara cambiar alguna información de la declaración jurada?
> R. No, no recuerdo.[94]

En el contrainterrogatorio, se enfatizó en las distinciones entre las notas tomadas por el testigo luego de entrevistar a la señora Cruz Bonilla el día de los hechos con sus expresiones juradas. Por ejemplo, si la apelante agredió al occiso con la mano

---

[88] TPO, T. II págs. 486-491.
[89] TPO, T. II págs. 494-496.
[90] TPO, T. II pág. 435.
[91] TPO, T. II pág. 456 líneas 1-11.
[92] TPO, T. II págs. 476-481; 509 líneas 13-19; 510 líneas 13-19.
[93] TPO, T. II pág. 513 líneas 10-12.
[94] TPO, T. II pág. 515 líneas 8-11.

abierta o cerrada.[95] El testigo tampoco refirió que la señora Cruz Bonilla tuviera un moretón en el rostro, aun cuando ésta dijo haber sido agredida.[96] En fin, el agente García Rivas repasó la versión de la víctima sobreviviente de manera cronológica, a la luz de sus notas, la declaración jurada y la llamada al Sistema 911.[97] Se examinaron también sus gestiones investigativas y las del ICF en El Tuque y con el vehículo en el hospital.[98]

Los hechos criminales que nos ocupan contaron con dos testigos presenciales que declararon en el juicio.

### Luis Manuel Báez

Para la fecha de los hechos que nos competen, el testigo había trabajado como cartero del correo de los Estados Unidos por diez años.[99] El 14 de noviembre de 2022, a las 4:42 de la tarde, se encontraba conduciendo una guagua blanca rotulada en la ruta 45, en El Tuque, en Ponce, entregando correspondencia en la residencia D88, cuando escuchó que surgió una discusión.[100]

Observó a la señora Napoleoni Medina, a quien conocía de vista e identificó en Sala, parada frente a su casa.[101] Ubicado entre unos diez a 15 pies de distancia —y unos 25 a 30 pies de la casa de la apelante— el testigo declaró que venía bajando un carro Yaris y escuchó que la apelante le dijo al muchacho que manejaba el vehículo: "Vas contra el tránsito". El joven le respondió que no había ningún "sign".[102] Escuchó a la apelante que expresó: "Tú me estás grabando" y ésta incurrió en una agresión contra el "muchacho que está en el vehículo". "[N]o sé en qué parte del cuerpo fue la agresión,

---

[95] TPO, T. II págs. 555-557.
[96] TPO, T. II pág. 583 líneas 7-12.
[97] TPO, T. II págs. 584-588; 597; T. III págs. 607 líneas 12-19; 608, 609 líneas 1-5; 625-649.
[98] TPO, T. III págs. 650-662.
[99] TPO, T. I págs. 179 líneas 16-19; 180 líneas 1-4.
[100] TPO, T. I págs. 180; 181 líneas 1-10.
[101] TPO, T. I págs. 181 líneas 13-19; 182-183; 293 líneas 4-5.
[102] Para el testigo Báez, el Yaris iba en dirección contraria. TPO, T. I pág. 225 líneas 10-17. Sin embargo, el Exhibit 16 estipulado certifica que el tránsito en la calle 8B, Sector Nueva Vida, El Tuque, discurría de manera bidireccional.

fue con las manos...".[103] Luego de la agresión, el testigo vio que el muchacho, Jancarlo Rivera Lugo, le echó "pepper spray" a la señora Napoleoni Medina. Declaró que observó a la apelante sacudirse los ojos; y el declarante continuó con su ruta de correo en la residencia D89. Entonces, cuando estaba entregando correspondencia en la residencia D101, escuchó una detonación.[104] "Vi un muchacho en el suelo, vi, este, una muchacha al lado, y vi un muchacho con, con un rifle en las manos, sin culata, tenía color marrón, y venía un... una 'pickup', venía subiendo".[105] No vio a la apelante en ese momento.[106] No pudo identificar al hombre armado, pero al ser militar aseveró que conocía sobre armas de fuego. Indicó que se puso nervioso y asustado, por lo que montó su vehículo y salió del lugar.[107]

Tres días después de los hechos, en Las Batatas de El Tuque, por temor a su seguridad, accedió a brindar su número telefónico a una persona desconocida que lo interceptó. Alrededor de una semana después, recibió una llamada de una mujer que lo afectó mentalmente. Si bien no declaró sobre lo expresado, lo cierto es que el señor Báez no se sintió seguro de trabajar en el correo y renunció al oficio de cartero.[108]

El 11 de enero de 2023, luego de recibir una citación, fue entrevistado por el agente García Rivas y prestó una declaración jurada al Ministerio Público, lo cual no había hecho con anterioridad, según reiteró, por temor a su seguridad.[109]

---

[103] En la declaración jurada que prestó el señor Báez no estaba seguro que fuera con las manos porque no pudo observarlo bien. TPO, T. I págs. 272 líneas 7-13; 285 líneas 15-18.

[104] TPO, T. I págs. 183 líneas 8-19; 184-188; 223 líneas 4-6; 226 líneas 15-16; 228 líneas 8-9.

[105] TPO, T. I pág. 188 líneas 16-18.

[106] TPO, T. I pág. 194 6-9. Además, TPO, T. II pág. 571 líneas 5-13.

[107] TPO, T. I págs. 189-190.

[108] TPO, T. I págs. 195-208.

[109] TPO, T. I págs. 209-211; 216 líneas 3-6; 217 líneas 14-17.

En el contrainterrogatorio, el testigo negó insistentemente haber visto a tres individuos armados en el área.[110] Sobre los hechos narrados, indicó que luego de la agresión, no escuchó que lo mandaran a bajar, pero Jancarlo Rivera Lugo se bajó del vehículo, se dirigió hacia la apelante con el teléfono móvil en una mano y el "pepper spray" en la otra. Le echó el "pepper spray" en la cara a la señora Napoleoni Medina y ella se limpió.[111] El testigo entendió que la señora Napoleoni Medina buscó auxilio a su casa para tratar de sacarse el "pepper spray". Una vez escuchó la detonación, miró y vio al individuo armado al que no identificó.[112] No vio al individuo armado agredir a la señora Cruz Bonilla. Además de al señor Pietri Napoleoni, vio a la señora Cruz Bonilla de pie junto a Jancarlo Rivera Lugo que yacía en el pavimento.[113] En cuanto a la señora Napoleoni Medina, el testigo supo su nombre por las redes sociales.[114]

### *Jineyshka Cruz Bonilla*

La señora Cruz Bonilla indicó que, para el 14 de noviembre de 2022, llevaba conviviendo un año con su prometido, Jancarlo Rivera Lugo, en la barriada Nueva Vida, en El Tuque, calle 12. La pareja llevaba cuatro años de relación.[115] Narró que, a las 4:40 de la tarde, salieron a comprar decoraciones navideñas, en el vehículo Yaris azul, por la ruta de la calle 8, ya que era más rápido.[116]

> P. [...] Mientras ustedes, verdad, se disponían... transitaron por esa calle 8 ese día 14 de noviembre del 2022, alrededor de las 4:40 de la tarde, ¿qué, si algo, sucedió? Dígale al Señor Juez.
>
> R. Asesinaron a mi prometido.
>
> P. 'Us'... ¿Perdón?
>
> R. Asesinaron a Jancarlo[].

---

[110] TPO, T. I págs. 224 líneas 1-6; 225 líneas 1-6; 227 líneas 3-5; 233 líneas 12-14; 257 líneas 2-5.
[111] TPO, T. I págs. 228 líneas 10-19; 229-230; 271.
[112] TPO, T. I págs. 231-232; 287 líneas 14-18.
[113] TPO, T. I págs. 234; 242-243; 289 líneas 16-19.
[114] TPO, T. I págs. 246 líneas 7-9; 291 líneas 2-5.
[115] TPO, T. III pág. 770.
[116] TPO, T. III págs. 771; 772 líneas 1-5.

P. Bien. Pero entonces, explíquele al Tribunal 'ques'... verdad, los detalles. ¿Qué sucedió cuando ustedes tomaron esa calle?

R. 'Íbanos' bajando, por la calle 8, observamos que en la parte de atrás habían [*sic*] tres (3) personas...

P. Cuando usted dice: "En la parte de atrás"...

R. La parte de arriba.

P. En la parte de arriba.

R. Sí.

P. Ok. Esa calle ustedes la, la tomaron, ¿subiendo o bajando?

R. 'Íbanos' bajando.

P. Estaban bajando. ¿En qué lugar del vehículo estaba usted?

R. Al lado del chofer.

P. Y Jancarlo[], ¿dónde estaba?

R. De chofer.

P. De chofer. Cuando usted dice que vieron tres (3) individuos, ¿a qué lado le quedaban de usted? Si usted va en el lado del pasajero.

R. Izquierda.

P. A su mano izquierda.

R. Sí.

P. Ok. Y entonces, ¿en qué área usted vio esos individuos de esa calle?

R. En la...

P. Cuando...

R. ... 'par'...

P. ...ustedes empiezan a bajar.

R. En la partecita más arriba.

P. Arriba.

R. Sí.

P. Ok. Y entonces, ¿qué, si algo, le llamó la atención a usted de esos individuos?

R. Sus armas, tenían armas en la cintura.

P. Tenían armas en la cintura.

R. Sí.

P. Bien. Y entonces, una vez usted hace esa observación inicial, ¿qué fue lo próximo que sucedió?

R. Cuando empezamos a bajar una Señora nos manda a detener, le grita a Jancarlo[] que por ahí no se baja, se acerca al vehículo, en eso Jancarlo[] le dice que no hay rótulos ninguno...

P. 'Ujum'.

R. ... 'atonce' ella procede a golpear a Jancarlo[], Jancarlo[] en defensa propia le quita... le tira "pepper spray" en...

P. ¿Dónde...

R. ...el...

P. ...estaba ese "pepper"?

R. En el llavero de, de la llave del carro.

P. Y, ¿qué él tuvo que hacer para...

R. Apagar...

P. ...obtener...

R. ...el carro.

P. ...el "pepper"? ¿Perdón?

R. Apagar el carro.

P. Apagó el carro.

R. 'Ujum'.

P. ¿Qué es lo próximo que Jancarlo[] hace?

R. Después de tirarle "pepper spray" le tira una foto.

P. ¿Con qué?

R. Con su teléfono.

P. 'Ajá'. En ese... En ese momento, esa Señora que usted indica, ¿en qué actitud se encontraba?

R. Alterada.

P. Alterada. Y una vez Jancarlo[] usted dice que le toma la foto, ¿qué fue lo próximo que sucedió allí?

R. Jancarlo[] llama al 911.

P. De... ¿De qué teléfono lo llamó?

R. [ININTELIGIBLE]

P. ¿Perdón?

R. Del teléfono de él.

P. Del teléfono de él. Llamó al 911. Y, ¿qué fue lo próximo que usted escuchó allí?

R. Lo mandan a bajar.

.      .      .      .      .      .      .      .

P. ¿Qué usted escuchó en relación a esa llamada que hizo Jancarlo[]?

R. Jancarlo[] había dicho que había un problema en la calle 8.

P. Dijo que había un problema en la calle 8.

R. Sí.

P. 'Ajá'. Y, ¿qué pasó?

R. Luego de eso Jancarlo[] se puso su teléfono en el bolsillo.

P. Ok.

R. Ella llama a alguien diciéndole: "Sal, que me hicieron...

P. Ok.

R. ...algo"...

P. Pero vamos, vamos por parte. Usted dice que luego de la llamada él se puso el teléfono en el bolsillo.

R. Así.

P. Y usted indicó, ¿qué quién le... ¿quién les dijo a ustedes que se bajaran?

R. Ella.

P. Y, ¿qué ustedes hicieron?

R. Nos bajamos.

P. Ok. ¿Por qué lado se bajó Jancarlo[]?

R. Jancarlo[] se va por el área del chofer y yo por la área de al 'lao'.

P. Y, ¿hacia dónde se movieron ustedes?

R. 'Pa' la parte de atrás del auto.

P. A la parte de atrás, ¿de qué auto?

R. Del de Jancarlo[].

P. Del de Jancarlo[]. Y una vez están en la parte de atrás en... del auto, le pregunto, ¿qué descripción usted puede darnos de esa señora?

R. Cachetona, achinada, blanquita, no era alta, pelo rubio, castaño, con puntas negras, tenía un pantalón largo azul, una camisa color "peach" con bordaditos, y unas sandalias negras.

P. Le pregunto, en ese momento que ustedes se mueven a la parte de atrás del vehículo, ¿a qué distancia le quedó esa Señora de usted? La que usted acaba de describir.

R. No sabría...

.      .      .      .      .      .      .      .

HON. JUEZ ÁNGEL LLAVINA FOLGUERA:

... que son aproximadamente tres (3) pies, cuatro (4) pies?

FISCAL ANNETTE ESTEVES SERRANO:

Podría ser, Juez.

LCDO. CARLOS TORRES NOLASCO:

Conteste con esa estimación, Juez.

HON. JUEZ - ÁNGEL LLAVONA FOLGUERA:

Parece ahí...

LCDO. CARLOS TORRES NOLASCO:

Según lo que testifica la testigo.

HON. JUEZ - ÁNGEL LLAVONA FOLGUERA:

Sí.

FISCAL - ANNETTE ESTEVES SERRANO:

P. Mire, y entonces, testigo, le pregunto, en ese momento, ¿qué es lo próximo que sucedió allí?

R. [ININTELIGIBLE] llamar a alguien...

P. Ok. Eso no me lo ha dicho. En... Usted dice que, ¿quién llamó a alguien?

R. Ella.

P. ¿Quién es ella?

R. La que buscó el problema.

P. La que buscó el problema. Le pregunto, esa persona, ¿usted sabe dónde está hoy?

R. Sí.

P. ¿Usted puede mirar alrededor de la Sala?

R. Sí.

P. Indíquele al Tribunal.

R. Ahí presente.

P. ¿Ahí presente? ¿Cómo está vestida hoy? A la persona que usted ha señalado.

R. Unos zapatos negros y la ropa de preso.

P. Bien.

Identifica a la imputada, Vuestro Honor.

P. Mire, y entonces usted dice que esta Señora hace una llamada.

R. Sí.

P. Y, ¿qué fue lo que usted escuchó?

R. "Sal que me hicieron algo".

P. ¿Puede hablar un poquito más alto? Que no la escuché.

R. "Sal que me hicieron algo".

P. Sal que me hicieron algo.

R. Sí.

P. Y, ¿qué es lo próximo que sucedió allí?

R. Salió alguien.

P. Salió alguien. Salió alguien, ¿de dónde?

R. Había una casa al frente, esta, de cemento, que estaba en construcción con caballos, y salió alguien armado de ahí.

P. Salió alguien armado de ahí.

R. Sí.

P. Ese alguien, le pregunto, ¿era hombre o mujer?

R. Hombre.

P. Un hombre. ¿Puede describirlo al Tribunal?

R. No era alto, blanquito 'achinao', [ININTELIGIBLE] pelo negro, no le vi tatuajes, tenía una camisa blanca, un pantalón negro hasta las rodillas de jugar baloncesto, y tenía unas chancletas negras.

P. ¿De qué edad aproximada?

R. Era de [ININTELIGIBLE] como veintitrés (23) años.

P. Ok. Y le pregunto, usted dice que ese individuo sale y, ¿qué hace una vez sale y usted... que, que... Usted dice que estaba armado. ¿Puede describirle al Tribunal qué usted le vio en las manos?

R. Un arma.

P. ¿Puede describir esa arma?

R. Sí. Era un arma así...

P. ¿Puede levantar sus manos para que el Señor Juez la vea?

R. Un arma así con una punta negra, en la parte de arriba tenía come algo de color madera, como ese color, 'am', abajo tenía recargador, era como así, tamaño... no era ni grande, ni pequeña.

P. Bien. Y una vez ese individuo usted dice que sale de esa casa con un arma de fuego, ¿qué es lo próximo que sucedió?

R. Bueno, salió, dijo: "¿Este cabrón fue?", 'am', me agredió, directamente...

P. ¿Con qué la agredió a usted?

R. Con el puño.

P. 'Ujum'.

R. Me agredió en la cara... luego [ININTELIGIBLE] apuntar con la pistola.

P. Le apunta con la pistola, ¿a quién?

R. A principio a mí.

P. Al principio fue a usted.

R. 'Ujum'.

P. ¿En qué lugar le apuntó a usted? Dígale al Señor...

R. Al...

P. ...Juez.

R. ...frente.

P. De frente. ¿A qué distancia de usted?

R. Él estaba a un (1) paso, dos (2) pasos de mí, estaba muy 'pegao'.

P. Ok. Y cuando usted dice que le apunta con el arma, ¿hacia dónde le apuntó? A usted.

R. Hacia la parte de arriba.

P. ¿Perdón?

R. Hacia la cara.

P. Hacia la cara. En ese momento, ¿dónde estaba Jancarlo[]?

R. Yo siempre mantuve a Jancarlo[] al lado mío, un poquito más 'pa' atrás.

P. Ok. Y entonces, una vez el individuo dice: "El cabrón este fue", refiriéndose, ¿a quién?

R. A Jancarlo[].

P. Y luego le apunta a usted, ¿qué fue lo próximo que sucedió allí en ese momento?

R. Él recargó.

P. ¿Quién recargó?

R. Él. El que tenía la pistola.

P. El que tenía la pistola. Y que... Él recargó. Cuando usted dice... 'Ajá'. Y, ¿qué fue lo 'prox'... lo... Inmediatamente recargó, ¿qué fue lo próximo que sucedió?

R. Cuando iba a disparar, en eso Jancarlo[] desvía la pistola y le da a él el tiro.

P. ¿Quién le dio un tiro a Jancarlo[]?

R. El que tenía la pistola.

P. Dígale al Señor Juez dónde se encuentra hoy el individuo que usted dice que le dio el tiro a Jancarlo[].

R. Ahí presente.

P. Tiene que mirar, Señora.

R. Ahí presente.

P. ¿Cómo está vestido?

R. Con la ropa de preso, color crema y unos zapatos negros.

P. Bien. En ese momento, testigo, ¿en qué posición se encontraba Jancarlo[] en relación al vehículo? De ustedes. Que usted ya de... declaró que están en la parte de atrás. ¿En qué posición estaba Jancarlo[] en relación al vehículo?

R. Jancarlo[] estaba de lado... al lado del baúl.

P. ¿Y usted?

R. Al lado de Jancarlo[], un poquitito más al frente.

P. Bien. Entonces, usted dice que en ese momento Jancarlo[] recibió un tiro, de parte del Señor que usted ha señalado en Sala...

.    .    .    .    .    .    .    .

P. Mire, testigo, usted dice que el individuo que le apuntó a usted recargó y cuando le va a disparar a usted, Jancarlo[] desvía el tiro, ¿verdad? Y, ¿quién recibe el tiro?

R. Jancarlo[].

P. Y, ¿quién fue el que disparó? En ese momento allí.

R. El que señalé.

P. El que señaló. ¿Lo puede señalar de nuevo?

R. Que está ahí presente.

P. ¿Qué fue lo que hizo ese Señor?

R. Recargó y le disparó a Jancarlo[].

P. Bien. Y, ¿qué pasó en ese momento con Jancarlo[]?

R. Jancarlo[] se me va de lado, me dijo: "Me dispararon" y se me va de lado y se me cae al piso.

P. Se cayó al piso.

R. Sí.

P. Y usted, ¿qué hizo en ese momento?

R. Me puse mala... [Testigo está sollozando] Cogí fuerza, 'pa' montarlo en el carro...

P. Bien. Y le pregunto, testigo, mientras eso está ocurriendo, ¿dónde estaba la Señora que usted señaló en Sala?

R. Cogiendo mi teléfono de mi abrigo.

.    .    .    .    .    .    .

P. La pregunta ahora es, en el momento exacto en que Jancarlo[] recibe el tiro y usted dice que se le va de lado, si usted pudo observar a esa Señora...

.    .    .    .    .    .    .

P. En ese momento. Específico.

R. Riéndose.

P. Estaba riéndose. ¿Qué pasó luego?

R. Luego yo saqué fuerza 'pa' coger a Jancarlo[], pedí ayuda, nadie me ayudaba... [Testigo está sollozando] ...estaba 'pesao'...

P. Ok. Y, ¿en qué momento es que ocurre lo que usted dijo del teléfono del abrigo?

R. Cuando yo estaba llevando a Jancarlo[] al carro.

P. Cuando lo estaba llevando hacia el carro.

R. Sí.

P. ¿Qué pasó con su teléfono que estaba en su abrigo?

R. Pues, la Señora me lo quitó.

P. ¿De qué manera se lo quitó de su abrigo?

R. Agresivamente.

P. Agresivamente. Testigo, estamos en el momento que usted está tratando, verdad, de coger a Jancarlo[], con el propósito, ¿de qué? ¿Qué era lo que usted quería hacer?

R. Llevarlo al hospital.

P. Y en ese momento, ¿cómo estaba él? Descríbale al Tribunal cómo usted observó en ese momento a Jancarlo[].

R. Él no podía ni hablar, estaba...

.    .    .    .    .    .    .

P. ¿Cómo usted lo observaba?

R. [ININTELIGIBLE] no reaccionaba, ni nada... [Testigo está sollozando y emitiendo audio ininteligible]

P. ¿Perdón?

R. No reaccionaba, ni nada.

P. Bien. Y, ¿qué pasó luego?

R. Luego lo monto a él en el carro, estaba buscando las llaves que no las encontraba. Había uno ahí, el que estaba grabando, y yo estaba buscando las llaves y él me señaló dónde estaban las llaves. Yo las encontré, tan pronto me monté en el carro, que lo prendí, que me iba a ir, la Señora se mete por el cristal y arrebata el teléfono del "dash".

P. ¿De dónde? El teléfono, ¿de dónde? ¿Qué teléfono?

R. El de Jancarlo[].

P. ¿Dónde estaba ese teléfono?

R. En el "dash".

P. ¿Quién lo había puesto allí?

R. Yo.

P. Usted. Y, ¿de qué manera esa señora... ¿Qué Señora le 'arrebasó' ese teléfono?

R. La que está ahí sentada.

P. 'Ajá'. ¿De qué manera le arrebató el teléfono...

R. Agresiva...

P. ... [ININTELIGIBLE]

R. ...también.

P. Bien. Le pregunto, usted ya había declarado que ese teléfono Jancarlo[] había llamado de ese teléfono al 911, ¿correcto?

R. Sí.

P Le pregunto si... que usted conozca, si esa llamada había culminado o no.

R. Cuando yo lo puse en el "dash" lo había... lo... no estaba colgado todavía.

P. La llamada estaba abierta.

R. Sí.

.    .    .    .    .    .    .    .

P. ¿Qué pasó mientras ella le está arrebatando el teléfono?

R. Luego de arrebatarme el teléfono me mira a la cara y me dice que si digo algo me va a mandar a matar a mí también.

P. ¿Cómo usted... ¿Cómo usted se sentía en ese momento?, Jineyshka. Dígale al Tribunal.

R. Bueno, me sentía desesperada. Me sentía mal. Tenía enojo encima. Me sentía triste. Desesperada porque nadie me ayudó. Yo estaba enfocada en llevar a Jancarlo[] al hospital.

P. Y, en efecto, ¿qué usted hizo?

R. Llevarlo al hospital.

P. ¿De qué manera usted llegó al hospital?

R. De lo más rápido que pude por 'to' la calle, siendo honesta, y llegué tocando bocina 'pa' que atendieran rápido.

P. Ok. Mire, le pregunto, testigo... Cuando el Señor que usted ha identificado en Sala que le disparó a Jancarlo[], luego del disparo, ¿qué hizo esta persona?

R. Procede a golpear.

P. ¿Ah?

R. Procede a golpear.

.    .    .    .    .    .    .    .

P. ¿Qué hizo después que disparó?

R. ¿Cuando terminó de disparar como tal?

P. 'Ajá'.

R. Después de terminar de disparar como tal, como tal, iba a disparar otra vez. A Jancarlo[], cuando Jancarlo[] estaba en el piso, y ahí fue que yo dije que no.

.    .    .    .    .    .    .    .    .

P. Testigo, ¿por qué usted le dice al Tribunal que él iba a 'des'... a disparar de nuevo? El acusado, Jeromy Pietri.

R. Porque se, se formó 'pa' dispararle otra vez.

P. Se, ¿qué?

R. Se formó 'pa' disparar...

P Cuando usted dice: "Se formó", y hace un gesto con su mano, ¿qué usted quiere decir?

R. Que él estaba con la pistola así 'pa' Jancarlo[]...

P. A la posición en que estaba la pistola era, ¿hacia Jancarlo[]?

R. Sí.

P. Y en ese momento, ¿qué usted hizo o qué usted dijo?

R. Que no le iban a 'dis'... que, que tenían que matar a mí también.

P. ¿Qué usted le dijo?

R. Que me tenían que matar a mí también.

P. Ok.

R. Supliqué por la vida de él.

P. Suplicó por la vida de él.

R. Sí.

P. Y, ¿cuál fue la reacción de... del individuo?

R. No disparó más 'nah'.

P. No disparó más 'nah'.

R. Sí.

P. Y, ¿qué hizo? Luego.

.    .    .    .    .    .    .    .    .

R. Golpear.

P. 'Ajá'. ¿Y luego?

R. Luego de eso se fue directo a la casa...

P. Se fue, ¿hacia dónde?

R. Hacia la casa que tiene una puerta de metal y portón escarlata.[117]

P. Bien. Se fue hacia esa casa.

R. Sí.[118]

.    .    .    .    .    .    .    .    .

---

[117] La casa descrita corresponde a la residencia de la señora Napoleoni Medina. Refiérase a los Exhibits 4, 5, 6, 11, 23 y 24 estipulados y nota al calce 30 de esta *Sentencia.*
[118] TPO, T. III págs. 772-804.

Desesperada, la señora Cruz Bonilla llegó al Hospital Damas en Ponce.[119] Luego de recibir la noticia del deceso de Jancarlo Rivera Lugo, fue entrevistada por el agente García Rivas y narró los detalles más importantes del incidente, pero no todo.[120] En esa ocasión describió a los apelantes y la casa donde se internaron después del crimen.[121] La testigo identificó en Sala a ambos apelantes.[122]

Asimismo, la señora Cruz Bonilla describió su teléfono celular, un iPhone 13 azul "con un 'cover' de fuerza negro"; y el del occiso, un iPhone 13 negro.[123] Ninguno de los dos aparatos fue recuperado.[124] Al culminar el turno directo, la señora Cruz Bonilla expresó que la cadena de incidentes le ha causado coraje, tristeza y miedo.[125]

En los turnos de contrainterrogatorio, con relación a la versión de los hechos, la testigo indicó que cuando se acordaba de algo lo apuntaba y negó incurrir en contradicciones.[126] En general, los hechos se repasaron, a base de preguntas sugestivas. En esencia, la Defensa apuntó en varias inconsistencias entre el testimonio de la señora Cruz Bonilla y el del señor Báez, según antes expuestos, así como con la declaración jurada que la testigo prestó un año antes de la vista en su fondo.[127]

Por último, el desfile de prueba culminó con el Exhibit 3 del Ministerio Público, un cederrón con la grabación de la llamada que hizo Jancarlo Rivera Lugo al Sistema 911, el cual se reprodujo en

---

[119] TPO, T. III pág. 804 líneas 10-16.
[120] TPO, T. III págs. 805 líneas 7-14; 853; 855; 858 líneas 12-14.
[121] TPO, T. III págs. 806-807.
[122] TPO, T. III págs. 821 y 825.
[123] TPO, T. III págs. 826 líneas 16-18; 827 líneas 1-3.
[124] TPO, T. III pág. 827 líneas 4-5.
[125] TPO, T. III pág. 828 líneas 3-9.
[126] TPO, TPO, T. IV pág. 925 líneas 5-16.
[127] TPO, T. IV págs. 928-938; 950-963; 975-984; 988-994; 997-1000; 1003-1006; 1011; 1018; 1021; 1024; 1029-1037; 1056-1059; 1069-1088; 1090-1098; 1100-1101; 1003-1009; 1112-1113; 1116-1122. Cabe señalar que la declaración jurada de la señora Cruz Bonilla y las notas del agente García Rivas, a las que se hicieron referencia constante, no fueron parte de la evidencia ofrecida ni admitida en autos.

Sala.[128] Al inicio se escucha al occiso identificarse, denunciar una agresión por parte de una señora y decir que tenía un video "donde ella sale agrediéndome [...] desde el vehículo".[129]

Aproximadamente, al minuto uno y 30 segundos de la grabación, se escuchó una detonación, seguido de los gritos de la señora Cruz Bonilla. Luego, la señora Cruz Bonilla se comunicó directamente con el operador y denunció que le dispararon a su esposo.[130]

**(iii)**

En la causa del epígrafe, como mencionamos, el señor Pietri Napoleoni, si bien admite su participación en la muerte de Jancarlo Rivera Lugo, aduce que acudió en defensa de su madre y que el disparo fue culpa del occiso al empujar la punta del arma. Por otro lado, la señora Napoleoni Medina imputa a su hijo la responsabilidad, por ser éste quien disparó. Así, procura desentenderse de los crímenes de armas que allí sucedieron. En general, ambos apelantes se asientan en las alegadas contradicciones de las declaraciones de los testigos presenciales.

Con relación a las inconsistencias en las declaraciones de la señora Cruz Bonilla, se sabe que no hay testimonios perfectos. La señora Cruz Bonilla, por ejemplo, no vio al cartero ni a su vehículo. Ésta sí testificó haber observado a tres hombres armados en la cintura, a quienes no describió, pero afirmó que se mantuvieron en la parte de arriba de la vía, y en los que el cartero Luis Manuel Báez no reparó. Desde su ubicación, éste tampoco escuchó que los mandaran a bajar del vehículo Yaris. Ello, a diferencia de la señora Cruz Bonilla que, en el juicio, indicó que la apelante los mandó a

---

[128] TPO, T IV págs. 1172 líneas 12-19; 1173-1179; 1180 líneas 1-3.
[129] TPO, T. IV págs. 1172 líneas 13-18; 1173 líneas 13-14. Cabe señalar que, a pesar de que el occiso ubicó el incidente en la calle 12, el operador confirmó en el mapa que se trataba de la calle 8; véase, TPO, T. IV págs. 1172 línea 18 y 1179 líneas 7-17.
[130] TPO, T. IV pág. 1176 líneas 3-15.

bajar y en la declaración jurada, que no consta en autos, habló en plural. Además, la testigo se refirió indistintamente a una bofetada y puño, en alusión a la agresión propinada por la apelante al occiso, de la que sí testificó el señor Báez. Indicó que Jancarlo Rivera Lugo le tomó una fotografía a la señora Napoleoni Medina, en lugar de un video, como se desprende por sus propios dichos en la grabación del Sistema 911. La testigo no recordó si al salir el señor Pietri Napoleoni cargaba el arma con una o ambas manos. Tampoco constaba evidencia gráfica de los golpes que aquél le propinó a su aparición y cuando auxiliaba a su pareja yacente.

De entrada, cabe resaltar que la víctima sobreviviente y el señor Báez se encontraban en ubicaciones diferentes, las cuales incidieron en sus respectivas apreciaciones de los hechos. Como puede verse, luego del examen de las aludidas inconsistencias, somos de la opinión que, en esencia, no hay diferencias sustanciales que puedan provocar la revocación de las sentencias emitidas. Es decir, los hechos medulares que narran la comisión de los delitos de asesinato, su tentativa, la trilogía de infracciones a la Ley de Armas, el robo agravado y la amenaza no albergan contradicciones significativas. Ambos testigos ubican a los apelantes en la escena criminal y declaran sobre la comisión de los delitos imputados desde sus ópticas correspondientes: la señora Cruz Bonilla como víctima con una posición cercana a los agresores y el señor Báez como testigo ocular en una posición más retirada.

Conviene recordar que es suficiente la evidencia directa de un testigo que le merezca al juzgador entero crédito para probar cualquier hecho. Regla 110(d) de Evidencia, 32 LPRA Ap. VI, R. 110(d). Al considerar los elementos que utilizó el TPI para dar por probado los hechos, al palio de la norma probatoria citada, conferimos deferencia al TPI en su apreciación de la prueba testifical, aunque no se trate de un testimonio perfecto o libre de

contradicciones. Véase, *Pueblo v. Santiago et al, supra,* pág. 147. Al fin y al cabo, la determinación de si la prueba presentada en el juicio en su fondo demuestra o no la comisión de determinado delito —lo cual es una cuestión de hecho— compete exclusivamente al juzgador de los hechos. *Pueblo v. Bonilla Ortiz,* 123 DPR 434, 442 (1989).

Salvaguardado lo anterior, al aplicar el derecho a los hechos probados, de conformidad con la prueba desfilada, es nuestro criterio que quedó demostrado de forma fehaciente que la realidad de lo acontecido fue una muy distinta a las teorías que nos plantearon el señor Pietri Napoleoni y la señora Napoleoni Medina. De conformidad con la prueba admitida y creída por el TPI, el Ministerio Público demostró, más allá de duda razonable, que madre e hijo, en concierto y común acuerdo, cometieron los delitos imputados. Veamos.

Durante el año aproximado que llevaba residiendo en el sector junto a su pareja, Jancarlo Rivera Lugo había transitado en su vehículo marca Toyota, modelo Yaris, color azul, la calle 8 bidireccional, según certificado en el Exhibit 16 estipulado. El 14 de noviembre de 2022, cuando se dirigía a comprar decoraciones navideñas junto a la señora Cruz Bonilla, no fue la excepción.

Ese día, sin embargo, la apelante lo interceptó y le increpó que iba contra el tránsito, que por ahí no se bajaba. Esa expresión logró ser escuchada por el excartero. Jancarlo se detuvo y ripostó que no había ningún letrero que impidiera transitar en esa dirección. Entonces, la señora Napoleoni Medina le cuestionó: "¿Tú me estás grabando?"; y agredió al occiso, estando éste dentro de su vehículo, lo que también fue constatado por el señor Báez. Jancarlo apagó el vehículo y roció la sustancia de "pepper spray" hacia el rostro de la

señora Napoleoni Medina. Luego, llamó al Sistema 911 para denunciar la agresión. Eran las 4:42 de la tarde.[131]

Con la llamada al Sistema 911 todavía activa y mientras la pareja se encontraba ubicada detrás del vehículo Yaris, la señora Napoleoni Medina realizó una llamada y dijo: "Sal que me hicieron algo". El señor Pietri Napoleoni arribó con un arma de fuego en las manos y exclamó: "¿Este cabrón fue?". Agredió a la señora Cruz Bonilla en su rostro, le apuntó con el arma y recargó. En el instante del disparo, el Teniente del Ejército de los Estados Unidos, quien se encontraba de pie al lado de su pareja, un poco detrás de ésta, tocó la punta del arma y el disparo fatal lo impactó por el costado. La víctima cayó. La señora Napoleoni Medina reía. El señor Pietri Napoleoni continuó golpeando a la señora Cruz Bonilla y, cuando se disponía a disparar por segunda ocasión al abatido, la señora Cruz Bonilla suplicó por su vida y le dijo que tendrían que matarla a ella también. El apelante declinó y la señora Napoleoni Medina, agresivamente, sustrajo el teléfono celular de la señora Cruz Bonilla del bolsillo de su abrigo.

Entonces, la señora Cruz Bonilla comenzó a cargar a su pareja hasta el Yaris para llevarlo al hospital. Colocó el teléfono celular de Jancarlo en el tablero del vehículo, aun con la llamada al Sistema 911 activa. De la grabación se desprenden los gritos y sollozos de la víctima sobreviviente; e incluso la señora Cruz Bonilla alcanzó a informar que le dispararon a su esposo. Luego, cuando la sobreviviente logró montar al herido de bala en el vehículo y se disponía a partir, la apelante arrebató el celular del occiso. En esa ocasión, la señora Napoleoni Medina le verbalizó a la señora Cruz Bonilla que si decía algo "me va a mandar a matar a mí también".

---

[131] La grabación del Sistema 911 ubica a la señora Napoleoni Medina en el lugar de los hechos delictivos, donde con dificultad se aprecian expresiones tales como: "grabándome"; "te dije que por ahí no se podía bajar"; "pa' qué se pone guapito". Refiérase al Exhibit 3 del Ministerio Público, minutos 2:20-3:00.

La presencia de una persona en la escena criminal no necesariamente la vincula; ni su ausencia la exime. Es a base de la totalidad de las circunstancias, en particular los actos anteriores, coetáneos y posteriores, los que develan el tipo de participación en la comisión del delito. Para poder imponer la pena como autor, el Ministerio Público debe probar, más allá de duda razonable, que sin la participación de la persona imputada no se hubieran podido cometer los delitos de que se trate. Véase, E.L. Chiesa Aponte, *Derecho penal,* Revista Jurídica UPR, vol. 91, núm. 2 (2022), pág. 396. Es decir, se debe demostrar, fuera de duda razonable, la intervención intencional o la comisión de actos encaminados a facilitar la consumación del delito. *Pueblo v. Resto Laureano,* op. de conf., 206 DPR 963, 972 (2021), que cita a *Pueblo v. Lebrón Morales,* 115 DPR 113 (1984).

Con ello en mente y a la luz de los criterios de autoría del Artículo 44 del Código Penal, *supra,* es forzoso concluir que las respectivas participaciones a propósito de los apelantes Pietri Napoleoni y Napoleoni Medina fueron de esencial importancia para consumar los delitos de asesinato en primer grado y su tentativa. Al respecto de este caso, tal como el Tribunal Supremo ha expresado, no es necesario que el coautor ejecute personalmente alguno de los actos tipificados. Es suficiente su presencia pasiva si su responsabilidad puede establecerse por actos anteriores o como el resultado de un designio común. Véase, *Pueblo v. Meléndez Rodríguez,* 136 DPR 587, 621 (1994); *Pueblo v. Aponte González,* 83 DPR 511, 519-520 (1961), citados con aprobación en *Pueblo v. Resto Laureano, supra,* pág. 971. En el caso de autos, surge palmariamente cómo madre e hijo compartieron el control sobre todos los hechos criminales, de manera que éstos no se hubieran podido consumar sin la contribución significativa que cada uno de los perpetradores aportó antes, durante y después de incurrir en los

delitos imputados. Por un lado, la señora Napoleoni Medina interceptó a la pareja, agredió a Jancarlo, solicitó la presencia del señor Pietri Napoleoni ilegalmente armado y facilitó, fomentó e indujo a éste a cometer la tentativa de asesinato en contra de la sobreviviente y el asesinato de la víctima.

El análisis no prevenido del expediente es incompatible con la configuración del delito de asesinato en segundo grado o el delito de asesinato atenuado como alega el señor Pietri Napoleoni. El expediente no revela una mera actuación imprudente o temeraria; ni motivada por una perturbación mental o emocional excusable, como tipifican los aludidos delitos. Al contrario, las circunstancias que rodearon los hechos según narrados por los testigos oculares demuestran la intención específica, a propósito, de atentar contra la vida de la señora Cruz Bonilla y privar de la suya al occiso. Nótese que, según lo esbozado, para probar el asesinato en primer grado es suficiente demostrar que el autor o autores tuvieron la intención de matar, lo que es equivalente a actuar *con conocimiento*, *a propósito* y *temerariamente*, términos afines a la intención criminal.

Decididamente, en concierto y común acuerdo, la señora Napoleoni Medina y el señor Pietri Napoleoni participaron en la consumación de los delitos imputados. Como se conoce, para que se dé la existencia del concierto y común acuerdo entre los apelantes, no tenía que transcurrir un lapso determinado, sino que la intención de matar y la muerte misma, como se probó en este caso, se concibió en unos minutos, en el momento mismo del ataque. Véase, *Pueblo v. Rodríguez Vicente*, 173 DPR 292, 301 (2008). No albergamos contención alguna de que se probó, más allá de duda razonable, que el señor Pietri Napoleoni y la señora Napoleoni Medina fueron autores concertados de los actos que repercutieron en el asesinato en primer grado de Jancarlo Rivera Lugo y la tentativa de asesinato de la sobreviviente, señora Cruz Bonilla. No hubiera sido posible

incurrir en los delitos imputados sin las respectivas participaciones inmediatas y mediatas de los apelantes en la cadena de delitos. Ello así porque "la contribución material de cada coautor, sin importar cómo fue o en qué consistió, se consideran como un todo y el resultado lesivo total se le imputa a cada coautor por igual". Véase, *Pueblo v. Torres Feliciano*, 201 DPR 63, 85 (2018), citado en *Pueblo v. Resto Laureano*, *supra*, pág. 971.

En cuanto a las infracciones a la Ley de Armas de 2020, en nuestro ordenamiento jurídico, se reconoce que la posesión de un arma puede ser de naturaleza constructiva. La posesión constructiva se configura cuando, a pesar de que una persona no tiene la posesión inmediata del objeto, sí tiene el poder y la intención de ejercer el control o dominio sobre aquél. *Pueblo v. Meléndez Rodríguez, supra*, pág. 621. En estos casos "se impondrá responsabilidad penal a todas las personas que tengan conocimiento, control y manejo del bien prohibido, aun cuando no lo tengan bajo su posesión inmediata". *Id.*, que cita *a Pueblo en interés menor F.S.C.*, 128 DPR 931, 940 (1991). La posesión constructiva también se configura cuando varias personas con conocimiento comparten control sobre el objeto delictivo. *Pueblo v. Rivera Rivera*, 117 DPR 283, 294 (1986). En el caso de los apelantes, el señor Pietri Napoleoni fue quien portó sin licencia, apuntó el arma contra la señora Cruz Bonilla, la recargó y la disparó, asesinando a Jancarlo Rivera Lugo. No obstante, por su indubitada autoría en la participación de los hechos criminales, con actos anteriores, coetáneos y posteriores según reseñados, la señora Napoleoni Medina también es imputable de los delitos de armas, cuyas penas, por disposición legal, se extinguen consecutivamente.

Con relación al robo agravado, justipreciamos que ambos apelantes son coautores de los cargos criminales imputados. Se probó, sin razonable duda, la concertada apropiación ilegal de los

celulares pertenecientes al occiso y a la víctima sobreviviente; sustrayéndolos en su inmediata presencia y contra de su voluntad; mediante violencia, toda vez que fueron objeto de un disparo mortal y golpes, respectivamente.

Finalmente, la señora Cruz Bonilla testificó y el TPI le confirió entera credibilidad que, cuando se disponía a llevar al occiso al hospital, la señora Napoleoni Medina le dijo que, si decía algo, también la mandaría a matar. La expresión fue una amenaza explícita que evidentemente la apelante era capaz de cumplir. Tenemos certeza de que, con este proceder, se configuró el delito que le fue imputado. Colegimos, pues, que no se cometió error al encontrar culpable a la apelante de amenazar de forma verbal a la señora Cruz Bonilla, siendo ésta una testigo con pleno conocimiento de los hechos, que pudiera, como en efecto ocurrió, ser llamada a prestar testimonio en cualquier investigación y procedimiento judicial.

En suma, no encontramos error en la apreciación de la prueba arribada por el juzgador de los hechos; ni indicios de pasión, prejuicio, parcialidad o error manifiesto que justifiquen nuestra intervención revisora, por lo que procede la confirmación de las *Sentencias* impugnadas.

**IV.**

Por los fundamentos previamente expresados, los cuales hacemos formar parte de este dictamen, se confirman las *Sentencias* apeladas.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones